BEVERLY HILLS FAN COMPANY,
Plaintiff–Appellant,

v.

ROYAL SOVEREIGN CORP. and
Ultec Enterprises Co., Ltd.,
Defendants–Appellees.

No. 92–1326.

United States Court of Appeals,
Federal Circuit.

March 8, 1994.

G. Franklin Rothwell, Rothwell, Figg, Ernest & Kurz, P.C., of Washington, DC, argued for plaintiff-appellant. With him on the brief were Raymond A. Kurz and Celine M. Jimenez.

Jeffrey G. Sheldon, Sheldon & Mak, of Pasadena, CA, argued for defendants-appellees. With him on the brief was Elizabeth L. Swanson.

Before NEWMAN, Circuit Judge, SMITH, Senior Circuit Judge, and PLAGER, Circuit Judge.

PLAGER, Circuit Judge.

This is a patent infringement case in which we are called upon to determine whether the district court properly declined to exercise personal jurisdiction over foreign (from the standpoint of the forum) accused infringers or whether, applying the stream of commerce theory, plaintiff made the required jurisdictional showing. Beverly Hills Fan Company (Beverly) appeals the judgment of the United States District Court for the Eastern District of Virginia (Civil Action No. 91–1834–A), dated March 6, 1992, dismissing Beverly's complaint for lack of personal jurisdiction over defendants Royal Sovereign Corp. (Royal) and Ultec Enterprises Co., Ltd. (Ultec). That judgment was entered upon defendants' motion brought pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. We

reverse and remand for further proceedings consistent with this opinion.

## BACKGROUND

Beverly is the current owner of U.S. Design Patent No. 304,229 (the '229 patent), which issued on October 24, 1989. That patent is directed to the design of a ceiling fan. Beverly is incorporated in Delaware and has its principal place of business in California.

Ultec is the manufacturer of a ceiling fan which Beverly alleges infringes the '229 patent. Ultec is incorporated in the People's Republic of China (PRC) and manufactures the accused fan in Taiwan. Royal imports into and distributes the accused fan in the United States. It is incorporated in New Jersey.

On December 11, 1991, Beverly filed suit against Ultec and Royal in the United States District Court for the Eastern District of Virginia. Beverly's complaint alleged in relevant part that both defendants are infringing and inducing infringement of the '229 patent by selling the accused fan to customers in the United States, including customers in Virginia; and that defendants are selling the accused fan to the Virginia customers through intermediaries.

Ultec and Royal subsequently filed a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. In support of their motion, defendants submitted several declarations. A first declaration was from James Cheng (the Cheng Declaration), the President of Ultec. In that declaration, Mr. Cheng stated that Ultec has no assets or employees located in Virginia; has no agent for the service of process in Virginia; does not have a license to do business in Virginia; and has not directly shipped the accused fan into Virginia. A second declaration was from T.K. Lim (the Lim Declaration), the President of Royal. In that declaration, Mr. Lim stated that Royal, as well, has no assets or employees in Virginia; has no agent for the service of process in Virginia; does not have

a license to do business in Virginia; made a one-time sale of unrelated goods to Virginia in 1991 which represented less than three percent of Royal's total sales that year; and has not sold the accused fan to distributors or anyone else in Virginia.

Beverly then submitted several declarations in opposition to the motion. A first declaration was from Lyndal L. Shaneyfelt (the first Shaneyfelt Declaration), a private investigator. In that declaration, Mr. Shaneyfelt stated that, on December 4, 1991, he purchased one of the accused fans from the Alexandria, Virginia outlet of a company known as Builder's Square; that a manual accompanying the fan identified Royal as the source of the fan; that the fan was accompanied by a warranty which Royal would honor; and that Builder's Square has approximately six retail outlets located throughout Virginia. A second declaration was from Shelley A. Greenberg (the Greenberg Declaration), the President of Beverly. In that declaration, Mr. Greenberg stated that Beverly does a substantial amount of business in Virginia; that Beverly's Virginia customers include all six Builder's Square outlets; and that Beverly sells a commercial embodiment of the '229 patent to customers in Virginia through these outlets.

The trial court, after argument from the parties and consideration of their written submissions, ruled on the motion. The court correctly recognized that there were two limits to its jurisdictional reach: Virginia's long-arm statute and the Due Process Clause of the U.S. Constitution.[1] The court found its analysis of the limits imposed by the Due Process Clause conclusive of the matter.

Relying on Supreme Court precedent as interpreted by the Fourth Circuit in *Chung v. NANA Development Corp.*, 783 F.2d 1124 (4th Cir.), *cert. denied,* 479 U.S. 948, 107 S.Ct. 431, 93 L.Ed.2d 381 (1986), the court concluded that the relevant inquiry was whether defendants' contacts with the forum were sufficiently purposeful that litigation in

---

1. *See Peanut Corp. of Am. v. Hollywood Brands, Inc.*, 696 F.2d 311, 313 (4th Cir.1982). The Due Process Clause that is at issue here is the Due Process Clause of the *Fifth Amendment. See, e.g.,* *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1389 n. 2, 20 USPQ2d 1450, 1453 n. 2 (8th Cir.1991).

the forum could reasonably have been foreseen. The only purposeful contact the court considered relevant was the one-time shipment of unrelated goods referred to in the Lim Declaration.[2] Finding that such contact was not sufficient to make litigation in Virginia reasonably foreseeable, the court granted the motion to dismiss. On March 6, 1992, an order granting judgment for defendants was entered consistent with the court's ruling.

Beverly subsequently filed a motion for reconsideration of the March 6 judgment. In support of that motion, Beverly submitted a second declaration by Mr. Shaneyfelt (the second Shaneyfelt Declaration). In that declaration, Mr. Shaneyfelt stated that, as of March 17, 1992, based on telephone conversations with unnamed employees at the six Builder's Square outlets, fifty-two of the accused fans were available for sale at these outlets. Defendants then moved to strike this evidence, and opposed the motion for reconsideration. On April 8, 1992, the court denied the motion for reconsideration, presumably denying the motion to strike.[3] This appeal followed.

## DISCUSSION

### 1.

During the pendency of this appeal, defendants moved in this court to strike the second Shaneyfelt Declaration on the grounds that it is not properly before us. A motions panel of this court denied defendants' motion, deferring the matter to the merits panel. We turn to this issue first. When appropriate, we are guided by Fourth Circuit law on the purely procedural aspects of this question.[4]

■ Defendants make several arguments why we cannot consider the second Shaney-

felt Declaration. Their first argument is premised on a purported deficiency in Beverly's papers. The first sentence in Beverly's notice of appeal refers only to the March 6 Order and Judgment:

> Notice is hereby given that [Beverly] hereby appeals ... from the Order and Judgment dated March 6, 1992, granting Defendants' Motion to Dismiss for Lack of Personal Jurisdiction in Civil Action No. 91–1834–A.

Thus, argue defendants, as to the April 8 decision on the motion for reconsideration, the notice fails to comply with Fed.R.App.P. 3(c), which states in relevant part: "The notice of appeal ... shall designate the judgment, order or part thereof appealed from." Defendants further argue that since a failure to comply with Fed.R.App.P. 3(c) is a fatal jurisdictional defect, *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 314, 108 S.Ct. 2405, 2407, 101 L.Ed.2d 285 (1988), this court would lack jurisdiction to review the April 8 decision, and thus the power to consider the record pertaining to that decision, including the second Shaneyfelt Declaration.

Defendants' focus is misplaced and too narrow; the proper focus is on the record as a whole. *See Foman v. Davis*, 371 U.S. 178, 181, 83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962); 9 James W. Moore et al., *Moore's Federal Practice*, ¶ 203.17[2], at 3–79 to –82 (2d ed. 1993). The second sentence of Beverly's notice expressly refers to the April 8 decision.[5] The parties briefed and argued the merits of that decision. And there is a substantial connection between the March 6 judgment, which is referred to in the first sentence of the notice, and the April 8 decision. Under similar circumstances, courts have not hesitated to exercise jurisdiction over a judgment or decision not expressly referred to in the notice of appeal. *See Trust Co. Bank v.*

---

**2.** The court inferred that the accused fan referred to in the first Shaneyfelt Declaration arrived in Virginia through an unknown third-party, and thus was not a purposeful contact.

**3.** The docket in case # 91–CV–1834 shows no entry disposing of the motion.

**4.** The Fourth Circuit is where the case arose; under *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1574–75, 223 USPQ 465, 471

(Fed.Cir.1984), we apply the law of the Fourth Circuit to procedural matters that are not unique to patent law.

**5.** That sentence reads:

> Plaintiff's request for reconsideration of the Order and Judgment entered on March 6, 1992 was filed within ten business days of the entry of the Judgment (on March 20, 1992) and was denied on April 8, 1992.

*United States Gypsum Co.,* 950 F.2d 1144, 1147–48 (5th Cir.1992); *Lockman Found. v. Evangelical Alliance Mission,* 930 F.2d 764, 772 (9th Cir.1991); *Matute v. Procoast Navigation Ltd.,* 928 F.2d 627, 629–30 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 329, 116 L.Ed.2d 270 (1991); *Matarese v. LeFevre,* 801 F.2d 98, 105–06 (2d Cir.1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987).

■ Defendants next argue that we cannot consider the second Shaneyfelt Declaration because there has been no showing that the information therein was "newly discovered evidence which by due diligence could not have been discovered [earlier]" as required by Fed.R.Civ.P. 60(b)(2). But Rule 60(b)(2) is not governing. The universal rule is that "if a post-judgment motion is filed within ten days of the entry of judgment and calls into question the correctness of that judgment it should be treated as a motion under Rule 59(e), however it may be formally styled." *Dove v. CODESCO,* 569 F.2d 807, 809 (4th Cir.1978); *see also Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 173 (5th Cir.1990); *Tylo Sauna, S.A. v. Amerec Corp.,* 826 F.2d 7, 8 (Fed.Cir.1987); *Vreeken v. Davis,* 718 F.2d 343, 345 (10th Cir.1983); *Lyell Theatre Corp. v. Loews Corp.,* 682 F.2d 37, 40–41 (2d Cir.1982). Since Beverly's motion for reconsideration meets these criteria, it is considered to have been brought under Rule 59(e) rather than Rule 60(b). Defendants' argument is thus off point.[6]

6. The text of Rule 59(e) contains no requirement that the grounds must be based on newly-discovered evidence. For a discussion of that factor and others to be considered in a 59(e) motion, see *Lavespere,* 910 F.2d at 174–75. We need not consider this aspect of the question further since it was not raised or argued by defendants.

7. *Compare* Fed.R.Civ.P. 12(b) *with* Fed.R.Civ.P. 56(e).

8. *Compare Theunissen v. Matthews,* 935 F.2d 1454 (6th Cir.1991) (hearsay evidence can be considered in conjunction with a Rule 12(b)(2) motion) *with Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986) (hearsay evidence cannot be considered in conjunction with a Rule 12(b)(1) motion).

9. The second Shaneyfelt Declaration is based on statements of Builder's Square employees having no apparent motive to overstate the number of

■ Defendants next argue that the second Shaneyfelt Declaration cannot be considered because it is based on hearsay and thus inadmissible. However, defendants have not cited any authority in support of such a rule. And we are unaware of any, either in the Federal Rules of Civil Procedure [7] or elsewhere.[8] Moreover, such a rule would be particularly inappropriate under the circumstances of this case since the evidence bears circumstantial indicia of reliability so that it very well could be admissible at trial notwithstanding its hearsay nature. *See* Fed. R.Evid. 803(24).[9]

Defendants were given the opportunity to challenge this evidence. Although the specific employees who provided the information were not named, the addresses of the Builder's Square outlets where these employees worked were provided. Defendants have not shown why they could not have independently surveyed the number of accused fans available for sale at these outlets. They can thus be said to have acquiesced in the trustworthiness of the evidence. For all the foregoing reasons, we decline to adopt the rule advanced by defendants.

■ The final evidentiary argument made by defendants is that the evidence cannot be considered since it relates to contacts with the forum occurring subsequent to the events giving rise to this litigation, and thus is irrelevant to whether specific jurisdiction can be exercised over the defendants.[10] The infor-

accused fans available for sale at their places of employment. If unaware of the litigation and Shaneyfelt's involvement, they might simply be responding to a potential customer inquiring about the quantity of available inventory that was on hand. Alternatively, if aware of the litigation and Shaneyfelt's identity, these employees would have had a motive to understate the number of available fans and thus decrease their employer's exposure to liability for patent infringement. *See also* Fed.R.Evid. 804(b)(5). *See generally* Michael H. Graham, *Handbook of Federal Evidence,* § 804.5 (3d ed. 1991).

10. "Specific" jurisdiction refers to the situation in which the cause of action arises out of or relates to the defendant's contacts with the forum. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 473 n. 15, 105 S.Ct. 2174, 2182 n. 15, 85 L.Ed.2d 528 (1985). It contrasts with "general" jurisdiction, in which the defendant's con-

mation in the second Shaneyfelt Declaration was obtained about 3 months after the complaint was filed. In conjunction with the first Shaneyfelt Declaration, it indicates that, contemporaneously with the filing of the complaint, defendants were engaged in continuous shipment of substantial numbers of the accused fan into Virginia. These shipments are the basis for Beverly's allegations that defendants infringed and induced infringement of the '229 patent.

The sole case on this point relied on by defendants, *Farmers Insurance Exchange v. Portage La Prairie Mutual Insurance Co.,* 907 F.2d 911, 913 (9th Cir.1990), is inapposite. That case involved a single tortious act which inflicted discrete injury on the victim. Defendant's contacts with the forum after the commission of the tort had no relation to the cause of action, and thus were irrelevant to whether specific jurisdiction could be exercised over the defendant. Here, by contrast, the two causes of action, direct infringement and inducing infringement, both involve the continuous infliction of injury upon the victim. *See Wilden Pump & Eng'g Co. v. Versa–Matic Tool, Inc.,* 20 USPQ2d 1788, 1790–91, 1991 WL 280844 (C.D.Cal.1991). The case is thus fundamentally different from that involving a single tort. In a case involving a continuous tort, it would be arbitrary to identify a single moment after which defendant's contacts with the forum necessarily become irrelevant to the issue of specific jurisdiction. *Cf. Bruno Wessel, Inc. v. McCourt,* No. C92–079TEH, 1992 U.S.Dist. LEXIS 6230, at * 6–* 11 (N.D.Cal. May 4; 1992).

For all of the above reasons, we find defendants' arguments on this issue unpersuasive; the second Shaneyfelt Declaration is properly a part of the record before us in this case.

### 2.

Paragraph 6 of the complaint alleges:

6. Ultec has for a time past and *still is* infringing and inducing infringement of the ['229 patent] by *selling* ceiling fans em-

bodying the patented invention *to customers* in the United States including customers *in the Eastern District of Virginia through intermediaries* and will *continue* to do so unless enjoined by this Court. (Emphasis added)

The thrust of this paragraph, insofar as it relates to jurisdiction in Virginia, is that Ultec is purposefully shipping and selling, through intermediaries, the accused fan to customers in Virginia, and that the shipping and selling are ongoing and continuous.

The evidence which, according to defendants, rebuts these allegations is paragraph 4 of the Cheng Declaration. But that paragraph only denies *direct* shipments and sales by Ultec into Virginia:[11]

4. Ultec has not imported nor *directly* sold any of its fans to importers or anyone else in Virginia. (Emphasis added)

Thus, there is not even direct contravention of the allegation, as the plaintiff's paragraph speaks only in terms of shipments through intermediaries. Since they are not directly controverted, plaintiff's factual allegations are taken as true for purposes of determining jurisdiction in the Virginia district court.

Paragraph 7 of the complaint alleges:

7. [Royal] has for a time past and *still is* infringing and inducing infringement of the ['229 patent] by *selling* ceiling fans *through an intermediary to customers in the Eastern District of Virginia,* such fans embodying the patented invention, and [Royal] will *continue* to do so unless enjoined by this Court. (Emphasis added)

The thrust of this paragraph, insofar as it relates to jurisdiction in Virginia, is that Royal is placing the accused fans into the chain of commerce, which includes shipping the fans into Virginia for sale to customers through an intermediary (Builder's Square). Defendants' response is Paragraph 2 of the Lim Declaration. Paragraph 2, however, is either inartfully phrased or craftily written. It states:

2. [Royal] imports ceiling fans from [Ultec]. [Royal] has never sold a fan to dis-

---

tacts have no necessary relationship to the cause of action.

11. It is undisputed that Ultec does not make direct shipments anywhere within the United States.

**1564**

tributors or to anyone else *in Virginia.*
(Emphasis added)

The phrase "in Virginia" may modify either the verb "sold" or the nouns "distributors" or "anyone else." Either way, Ultec's response does not directly contravene plaintiff's allegations; again, plaintiff's factual allegations must be taken as true.

Defendants next argue that Beverly has submitted no evidence showing that defendants' shipments into Virginia were purposeful or knowing. However, Beverly has shown by the two Shaneyfelt Declarations that the commercial relationship with Builder's Square was ongoing, and obviously intentional. It is undisputed that at least fifty-two Ultec fans were present in Virginia bearing Royal's warranty, reflecting an ongoing relationship with the Virginia retailer and customers. *See Kearns v. Wood Motors, Inc.,* 204 USPQ 485, 491 (E.D.Mich.1978). From these ongoing relationships, it can be presumed that the distribution channel formed by defendants and Builder's Square was intentionally established, and that defendants knew, or reasonably could have foreseen, that a termination point of the channel was Virginia.

#### 3.

In light of the trial court's conclusion to the contrary, based in part on a failure to draw the proper inferences from the undisputed facts, we must disapprove the court's granting of the motion to dismiss. No additional development of the record is necessary for a decision on defendants' jurisdictional motion. The matter presents a pure question of law. The specific question on which the matter turns is whether the Due Process Clause of the Federal Constitution or specific limiting provisions in Virginia's long-arm statute preclude the exercise of jurisdiction in a case in which an alleged foreign infringer's sole contact with the forum resulted

from indirect shipments through the stream of commerce.

■ As a preliminary matter, we consider whether we are bound to apply Fourth Circuit law to this question. As previously noted, the Fourth Circuit is where the case arose; under *Panduit Corp. v. All States Plastic Manufacturing Co.,* 744 F.2d 1564, 1574–75, 223 USPQ 465, 471 (Fed.Cir.1984), we apply the law of the Fourth Circuit to procedural matters that are not unique to patent law. Beverly argues that we are not bound to apply Fourth Circuit law in this case because the issue here is intimately related to substantive patent law. Thus, argues Beverly, we are free to develop our own law on this issue.

Beverly is correct. Although in one sense the due process issue in this case is procedural, it is a critical determinant of whether and in what forum a patentee can seek redress for infringement of its rights. As we explain more fully below, the stream of commerce theory has achieved fairly wide acceptance in the federal courts. But even when followed, the theory comes in several variants. The regional circuits have not reached a uniform approach to this jurisdictional issue. *See, e.g., Max Daetwyler Corp. v. R. Meyer,* 762 F.2d 290, 226 USPQ 305 (3d Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985) (no jurisdiction found); *Honeywell, Inc. v. Metz Apparatewerke,* 509 F.2d 1137, 184 USPQ 387 (7th Cir.1975) (jurisdiction found). Nor is there any apparent uniformity on the issue within the Fourth Circuit.[12] The application of an assumed Fourth Circuit law, or for that matter, the law of any particular circuit, would thus not promote our mandate of achieving national uniformity in the field of patent law. *See Panduit,* 744 F.2d at 1574, 223 USPQ at 470.

The creation and application of a uniform body of Federal Circuit law in this area would clearly promote judicial efficiency,

12. For example, the district court, interpreting the Fourth Circuit's *Chung* decision, 783 F.2d 1124, concluded the Fourth Circuit had not fully embraced the stream of commerce theory. In a case subsequent to *Chung,* however, *Federal Insurance Co. v. Lake Shore, Inc.,* 886 F.2d 654 (4th Cir.1989), the Fourth Circuit specifically declined to reject the stream of commerce theory,

and considered in detail its applicability to the case at hand. *Id.* at 659. And district court cases, both before and after *Federal Insurance,* indicate that various iterations of the theory are very much alive in the Fourth Circuit. *See Abel v. Montgomery Ward Co.,* 798 F.Supp. 322, 324 (E.D.Va.1992); *Weight v. Kawasaki Motors Corp.,* 604 F.Supp. 968 (E.D.Va.1985).

would be consistent with our mandate, and would not create undue conflict and confusion at the district court level.[13] Under circumstances such as these, we have held we owe no special deference to regional circuit law. *See, e.g., Biodex Corp. v. Loredan Biomedical, Inc.,* 946 F.2d 850, 855–59, 20 USPQ2d 1252, 1256–61 (Fed.Cir.1991), *cert. denied,* ⸺ U.S. ⸺, 112 S.Ct. 2957, 119 L.Ed.2d 579 (1992).

#### 4.

■ The Supreme Court stated in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), "due process requires ... that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain *minimum contacts* with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)) (Second emphasis added). Later cases have clarified that the minimum contacts must be 'purposeful' contacts. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (purposeful minimum contacts the 'constitutional touchstone' of the due process analysis). The requirement for purposeful minimum contacts helps ensure that non-residents have fair warning that a particular activity may subject them to litigation within the forum. *See Burger King,* 471 U.S. at 472, 105 S.Ct. at 2182; *see also World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490

(1980). Fair warning is desirable for non-residents are thus able to organize their affairs, alleviate the risk of burdensome litigation by procuring insurance and the like, and otherwise plan for the possibility that litigation in the forum might ensue. *See World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567.

Defendants argue that their contacts with Virginia were insufficient to give them warning that litigation in Virginia might ensue. We disagree. The allegations are that defendants purposefully shipped the accused fan into Virginia through an established distribution channel. The cause of action for patent infringement is alleged to arise out of these activities. No more is usually required to establish specific jurisdiction. *See Burger King,* 471 U.S. at 472–73, 105 S.Ct. at 2182; *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774–75, 104 S.Ct. 1473, 1478–79, 79 L.Ed.2d 790 (1984).[14]

Defendants argue that the exercise of jurisdiction over them is foreclosed by the holding in *World–Wide Volkswagen.* In *World–Wide Volkswagen,* jurisdiction did not lie over an alleged foreign tortfeasor whose product was transported into the forum state through the unilateral actions of a third party having no pre-existing relationship with the tortfeasor. 444 U.S. at 298, 100 S.Ct. at 567. There was thus no purposeful contact by the tortfeasor with the forum, and thus no basis for exercising personal jurisdiction over the defendants. Here, by contrast, the allegations are that the accused fan arrived in Virginia through defendants' purposeful shipment of the fans through an established distribution channel.[15] The Court in *World–*

---

**13.** Only in a very few jurisdictions would there be deviation from the law of personal jurisdiction already applied to foreign tortfeasors in the stream of commerce context. *See Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 118 n. 2, 107 S.Ct. 1026, 1035 n. 2, 94 L.Ed.2d 92 (1987) (Brennan, J., concurring in part and concurring in the judgment). Since an important role of the Federal Circuit is to eliminate forum shopping on either substantive or procedural grounds, consistency in this area would advance that role.

**14.** Plaintiff attempts to support this point by arguing that defendants were on notice of its infringement claim, and thus had fair warning that

a lawsuit for patent infringement could result. This is not the point; there is no requirement that the non-resident be on notice that a specific type of litigation might ensue.

**15.** The presence of an established distribution channel is a significant factor in the cases cited by the parties involving the stream of commerce theory. In plaintiff's cases, in which jurisdiction over the non-resident was found to exist, there was an established distribution channel into the forum. *See Dakota Indus., Inc. v. Dakota Sportswear, Inc.,* 946 F.2d 1384, 20 USPQ2d 1450 (8th Cir.1991); *Honeywell,* 509 F.2d 1137, 184 USPQ 387; *Kearns,* 204 USPQ 485; *Engineered Sports Prods. v. Brunswick Corp.,* 362 F.Supp. 722, 179

*Wide Volkswagen* specifically commented on the significance of this factual pattern: "[I]f the sale of a product of a manufacturer or distributor ... is not simply an isolated occurrence, but arises from the efforts of the [defendants] to serve, directly or indirectly, the market for its product ..., it is not unreasonable to subject it to suit." *Id.* at 297, 100 S.Ct. at 567. And "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 297–98, 100 S.Ct. at 567.

Since the decision in *World–Wide Volkswagen,* lower courts have split over the exact requirements of the stream of commerce theory. *See Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1548 & n. 17 (11th Cir.1993). In *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the Supreme Court reflected that split in the context of a case in which jurisdiction in California state courts was asserted for the purpose of requiring a Japanese corporation to indemnify a Taiwanese corporation on the basis of a sale made in Taiwan and a shipment of goods from Japan to Taiwan.

All of the Justices agreed that on the facts of the case before them, jurisdiction did not lie in California; and apparently all of the Justices agreed that the stream of commerce theory provides a valid basis for finding requisite minimum contacts. The split was over the exact requirements for an application of the theory.

Four Justices were of the view that an exercise of personal jurisdiction requires more than the mere act of placing a product in the stream of commerce. As Justice O'Connor expressed it, there must be in addition *"an action of the defendant purposefully directed toward the forum State." As-*

*ahi,* 480 U.S. at 112, 107 S.Ct. at 1032. (Emphasis in original) But four of the Justices considered the showing of 'additional conduct' unneeded:

> "The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale.... A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity."

*Id.* at 117, 107 S.Ct. at 1034–35 (Brennan, White, Marshall, & Blackmun, JJ., concurring in part and concurring in the judgment). Justice Brennan, writing for these Justices, considered this view to be the prevalent view among most courts and commentators. *Id.* at 117–18 & n. 1, 107 S.Ct. at 1034–35 & n. 1 (Brennan, J., concurring in part and concurring in the judgment).[16]

We need not join this debate here, since we find that, under either version of the stream of commerce theory, plaintiff made the required jurisdictional showing. When viewed in the light of the allegations and the uncontroverted assertions in the affidavits, plaintiff has stated all of the necessary ingredients for an exercise of jurisdiction consonant with due process: defendants, acting in consort, placed the accused fan in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there.

We are aware of five appellate decisions that address the stream of commerce theory in the context of intellectual property interests. In four cases, the courts found proper the exercise of personal jurisdiction over foreign defendants under circumstances not un-

USPQ 486 (D. Utah 1973). In defendants' cases, in which jurisdiction was found not to exist, there was no such channel in place. *See Gould v. P.T. Krakatau Steel,* 957 F.2d 573 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 304, 121 L.Ed.2d 227 (1992); *Marston v. Gant,* 351 F.Supp. 1122, 176 USPQ 180 (E.D.Va.1972).

16. Justice Stevens joined in the judgment of the Court, but did not join either of the conflicting opinions on the stream of commerce theory.

like those present here. In *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200, 209 USPQ 633 (D.C.Cir.1981), in an action for trademark infringement, two German plaintiffs sought to hale an Australian wine producer, its Australian subsidiary, a New York importer, and a District of Columbia liquor store into the District Court for the District of Columbia. The district court held that it lacked personal jurisdiction over the Australian defendants. It then declared that those defendants were indispensable parties, and thus dismissed the action against the other defendants.

The Court of Appeals for the District of Columbia reversed, holding that the district court could properly exercise jurisdiction over the Australian defendants. The court first considered the limits imposed by the Due Process Clause, and concluded they did not prohibit the exercise of jurisdiction. "The Australian defendants ... arranged for introduction of their wine into the United States stream of commerce with the expectation (or at least the intention and hope) that their products will be shelved and sold at numerous local outlets in diverse parts of the country. (Citations omitted.) As defendants recognize, therefore, the links between the claims in suit and the Australian defendants' arrangements to develop and serve a market in the United States make the district court here a fair and reasonable forum, within due process constraints, for the action plaintiffs have brought." *Id.* at 203, 209 USPQ at 636.

The court next considered the limits imposed by subsection A.4 of the District of Columbia's long-arm statute, a subsection modeled after subsection A.4 of Virginia's long-arm statute, discussed *infra*. *Id.* at 206–07 & n. 16, 209 USPQ at 638 & n. 16. Even though the plaintiffs were not residents of the forum, the court concluded that the 'injury' requirement was met because plaintiffs were selling their wine in the forum

side-by-side with the wines of defendants. *Id.* at 206, 209 USPQ at 638. The 'act or omission' requirement was deemed met by defendants' activities in attaching the disputed mark to their wine in Australia and then injecting the wine into the stream of commerce for sale in the United States. *Id.*[17]

The other three cases, *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 20 USPQ2d 1450 (8th Cir.1991), *Horne v. Adolph Coors Co.*, 684 F.2d 255, 217 USPQ 15 (3rd Cir.1982), and *Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137, 184 USPQ 387 (7th Cir.1975), reach the same result on similar facts. These cases are arguably distinguishable from the present one in that the owner of the intellectual property at issue in those cases was a resident of the forum. The Supreme Court, however, has made it clear that is not a determinative distinction:

> [W]e have not to date required a plaintiff to have 'minimum contacts' with the forum State before permitting that State to assert personal jurisdiction over a nonresident defendant.... [Although] plaintiff's residence in the forum may, because of defendant's relationship with the plaintiff, enhance defendant's contacts with the forum ...[,] plaintiff's residence in the forum State is not a separate requirement, and lack of residence will not defeat jurisdiction established on the basis of defendant's contacts.

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779–80, 104 S.Ct. 1473, 1480–81, 79 L.Ed.2d 790 (1984).

Another arguable difference between *Dakota*[18] and *Honeywell*[19] and the present case is the intentional nature of the foreign defendants' conduct in those cases. However, several months before the lawsuit was filed, and presumably before the fans referred to in the Shaneyfelt Declarations were shipped into Virginia, Ultec and Royal were notified of

**17.** The 'substantial revenue' requirement was likewise deemed met, even though the revenue derived from sales in the forum was negligible in absolute and percentage terms, because that revenue was greater than the District's per capita share of the revenue derived from defendants' eastern United States wine sales. *Stabilisier-*

*ungsfonds*, 647 F.2d 200, 206, 209 USPQ 633, 638.

**18.** 946 F.2d 1384, 1391, 20 USPQ2d 1450, 1454–55.

**19.** 509 F.2d 1137, 1144, 184 USPQ 387, 390.

Beverly's charge that the accused fan infringed the '229 patent. Thus it can be said that the defendants' conduct in this case was equally intentional.

A third potential difference between *Stabilisierungsfonds* and *Honeywell* and the present case is that the local retailer was not named in the present case as a defendant. However, that is a distinction without significance: in both *Dakota* and *Horne* the foreign manufacturer was subjected to the jurisdiction of the court even though the local retailer was not joined as a defendant.

The fifth case, the only one not supporting the outcome we reach, is *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 226 USPQ 305 (3rd Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985). In that case the foreign manufacturer's shipments of its products into the forum were described as "sporadic." *Id.* at 298–99, 226 USPQ at 312. There also was doubt whether the manufacturer knew of such shipments—the status, as an authorized distributor, of the entity responsible for bringing such shipments into the forum was in dispute. *Id.* at 298, 226 USPQ at 311. That is not the case here. We find this Third Circuit decision unpersuasive on the point.

### 5.

■ Notwithstanding the existence of purposeful minimum contacts, a due process determination requires one further step. As Justice Stevens put it in his concurrence in *Asahi*, " 'minimum requirements inherent in the concept of "fair play and substantial justice" may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities.' " 480 U.S. at 121–22, 107 S.Ct. at 1037 (Stevens, J., concurring in part and concurring in the judgment) (quoting *International Shoe*, 326 U.S. at 320, 66 S.Ct. at 160). In other words, even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied.[20]

In general, these cases are limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum. *See Burger King*, 471 U.S. at 477, 105 S.Ct. at 2185 (must be 'compelling case' of unreasonableness); *Keeton*, 465 U.S. at 774–75, 104 S.Ct. at 1478–79 (purposeful minimum contacts 'ordinarily' enough).

We conclude this is not one of those rare cases. Virginia's interests in the dispute are significant. Virginia has an interest in discouraging injuries that occur within the state. *See Keeton*, 465 U.S. at 776, 104 S.Ct. at 1479. That interest extends to design patent infringement actions such as the one here.

Virginia also has a substantial interest in cooperating with other states to provide a forum for efficiently litigating plaintiff's cause of action. *See id.* at 777, 104 S.Ct. at 1479. Beverly will be able to seek redress in Virginia for sales of the accused fan to consumers in these other states.[21] These other states will thus be spared the burden of providing a forum for Beverly to seek redress for these sales. And defendants will be protected from harassment resulting from multiple suits. *See id.*

■ That it is to plaintiff's advantage to adjudicate the dispute in the district court for the Eastern District of Virginia does not militate against its right to have access to that court. The court is part of the exclusive mechanism established by Congress for the vindication of patent rights. The fact that it has unique attributes of which plaintiff ap-

---

**20.** Five of the Justices considered *Asahi* "one of those rare cases" in which this rule defeated minimum contacts jurisdiction. *Asahi*, 480 U.S. at 116, 121, 107 S.Ct. at 1034, 1036 (Brennan, Stevens, White, Marshall, & Blackmun, JJ., concurring in part and concurring in the judgment).

**21.** Beverly is not precluded from bringing suit in Virginia just because the bulk of the harm inflicted on it may occur through sales in these other states. *See Keeton*, 465 U.S. at 779–80, 104 S.Ct. at 1480–81.

parently has an interest in taking advantage does not change the case.[22]

The burden on Royal does not appear particularly significant. Royal, being incorporated in New Jersey, is not located that far from Virginia. This is not a burden sufficiently compelling to outweigh Beverly's and Virginia's interests. *See Keeton,* 465 U.S. at 774–75, 104 S.Ct. at 1478–79. Ultec, on the other hand, will be required to traverse the distance between its headquarters in the PRC and the district court in Virginia, and will also be required to submit itself to a foreign nation's judicial system. *See Asahi,* 480 U.S. at 114, 107 S.Ct. at 1033. However, it is recognized that " 'progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome.' " *World–Wide Volkswagen,* 444 U.S. at 294, 100 S.Ct. at 565 (quoting *Hanson v. Denckla,* 357 U.S. 235, 251, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283 (1958)). And Ultec, through its business dealings with Royal, cannot profess complete ignorance of the judicial system of the United States. Accordingly, we conclude that the burden on Ultec, as well, is not sufficiently compelling to outweigh Beverly's and Virginia's interests.

### 6.

■ The final issue we must address is the applicability of Virginia's long-arm statute.[23]

Federal courts apply the relevant state statute when determining whether a federal court, sitting in a particular case, has personal jurisdiction over a defendant, even when the cause of action is purely federal. *See* Fed.R.Civ.P. 4(e)-(f).

Subsections A.3 and A.4 of the Virginia statute read:

A. A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:

\* \* \* \* \* \*

3. Causing tortious injury by an act or omission in this Commonwealth;

4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he ... derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth.

Beverly first argues that subsection A.3, the 'single act' provision[24] of Virginia's long-arm statute, applies. That provision requires "an act or omission in this Commonwealth," i.e., a tortious act or omission within Virginia. But jurisdiction here cannot be based on a tortious *omission,* since active inducement of infringement requires the *commission* of an affirmative act.[25] Nor is there support for

---

**22.** Beverly has submitted evidence showing that in 1991, the district court for the Eastern District of Virginia had the fastest mean time from filing to disposition (5 months) in civil cases, and the fastest mean time from issue to trial in civil cases (again 5 months) amongst all the district courts in the country. The following colloquy is from the March 6, 1992 hearing:

> THE COURT: Don't you all want this case here because it's a speedy docket and you can get a quicker trial?
> [PLAINTIFF'S COUNSEL]: Well, that is another point.

**23.** Va.Code Ann. § 8.01–328.1 (Michie 1992). The Virginia legislature intended Virginia's long-arm statute to extend the jurisdiction of the Virginia courts as far as due process would allow. *E.g., Weight,* 604 F.Supp. at 969–70. Thus, some courts, having completed the due process inquiry, have not considered it necessary to undertake an analysis under the long-arm statute. *E.g., Chung,* 783 F.2d at 1127 n. 2. On the other hand, the Virginia legislature also intended the

particulars of the long-arm statute to be satisfied even though it could be argued that a lesser standard would meet due process. *See Robinson v. Egnor,* 699 F.Supp. 1207, 1211 (E.D.Va.1988). Thus, other courts have considered it more prudent to undertake a separate analysis. *E.g., Loral Fairchild Corp. v. Victor Co. of Japan,* 803 F.Supp. 626, 629 n. 5, 25 USPQ2d 1701, 1702 n. 5 (E.D.N.Y.1992). We believe the latter is the proper course.

**24.** So-called because a single act can subject the tortfeasor to jurisdiction under this provision without offending due process. *See Darden v. Heck's, Inc.,* 459 F.Supp. 727, 731 (W.D.Va. 1978); *Navis v. Henry,* 456 F.Supp. 99, 100 (E.D.Va.1978).

**25.** Under 35 U.S.C. § 271(a) (1988), only an affirmative act (making, using, or selling the patented design) can give rise to the tort of direct infringement. Likewise, under governing case law, "[a] person induces infringement under § 271(b) by actively and knowingly aiding and abetting another's direct infringement." *C.R.*

finding such an affirmative act to have occurred in Virginia—there is nothing in the record suggesting that either defendant necessarily committed any affirmative act there.

■ The other relevant subsection of Virginia's long-arm statute, subsection A.4, also requires that a tortious injury occur in the state, but here the act or omission causing the injury can take place outside the state. The question, then, in determining whether subsection A.4 is applicable to the facts of this case, is whether a 'tortious injury' occurred in the Commonwealth of Virginia.

Beverly contends that *Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137, 184 USPQ 387 (7th Cir.1975) supports jurisdiction over defendants. In *Honeywell*, plaintiff brought suit in the Northern District of Illinois against a U.S. retailer, two U.S. distributors, and the foreign manufacturer of a product the sale of which in Illinois was alleged to infringe Honeywell's patent. The district court, applying the Illinois statute, dismissed the suit against the foreign manufacturer. On appeal, the Seventh Circuit reversed, holding that Honeywell had suffered a tortious injury in Illinois and, under that state's statute, jurisdiction was proper. *Id.* at 1142, 184 USPQ at 390–91.

The *Honeywell* decision can be read as holding that the injury occurred where infringing sales were made. Alternatively, however, *Honeywell* can also be read to mean that the situs of the injury is the situs of the intangible property interest, which is determined by where the patent owner resides (Honeywell's principal place of business was in Illinois). The law is unsettled on this

question; the district courts have read the case both ways.[26]

As noted, in a case such as this some courts consider the legal situs of an injury to intellectual property rights to be the residence of the owner of the interest.[27] The theory is that, since intellectual property rights relate to intangible property, no particular physical situs exists. If a legal situs must be chosen, it is not illogical to pick the residence of the owner.

At first glance this rule may not seem illogical, but there are good arguments against it. Among the most important rights in the bundle of rights owned by a patent holder is the right to exclude others. This right is not limited to a particular situs, but exists anywhere the patent is recognized. It seems questionable to attribute to a patent right a single situs. A patent is a federally created property right, valid throughout the United States. Its legal situs would seem to be anywhere it is called into play. This point is illustrated by the fact that, when an infringement occurs by a sale of an infringing product, the right to exclude is violated at the situs where the sale occurs.[28]

Other courts have avoided the problems created by the single-situs/place of residence idea, and found the situs of injury to intellectual property in an appropriate case to be the place of the infringing sale.[29] Although economic harm to the interests of the patent holder is conceptually different from the tortious injury to the patent holder's right to exclude others, recognizing the relationship between these concepts permits the court to assess realistically the legal situs of injury

*Bard, Inc. v. Advanced Cardiovascular Sys.*, 911 F.2d 670, 675, 15 USPQ2d 1540, 1544 (Fed.Cir. 1990) (citing *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 669, 7 USPQ2d 1097, 1103 (Fed.Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988)).

**26.** *See* 6 Donald S. Chisum, *Patents* § 21.02[3], at 21–182 (1993): "Two issues are left either implicitly or explicitly unresolved by the *Honeywell* decision. One concerns the 'place of injury' in a patent infringement situation.... Should any state were (sic) such acts occur constitute a place of injury even though it is not the patent owner's domicile?" The cases are gathered and the competing rules are discussed in David Wille, *Personal Jurisdiction over Aliens in Patent Infringement*

*Actions: A Uniform Approach Toward the Situs of the Tort*, 90 Mich.L.Rev. 658 (1991).

**27.** *See, e.g., Acrison, Inc. v. Control & Metering Ltd.*, 730 F.Supp. 1445, 1448, 14 USPQ2d 1833, 1836 (N.D.Ill.1990).

**28.** Other problems with the patent holder's residence rule, including the question of determining in a given case the location of the holder's 'residence,' are described in Wille, *supra* note 26, at 672–73.

**29.** *See, e.g., Interface Biomedical Lab. Corp. v. Axiom Medical, Inc.*, 600 F.Supp. 731, 740, 225 USPQ 146, 152 (E.D.N.Y.1985); *Amburn v. Harold Forster Indus., Ltd.*, 423 F.Supp. 1302, 1303, 200 USPQ 36, 37 (E.D.Mich.1976).

for purposes of determining jurisdiction over the patent holder's infringement claim.

Economic loss occurs to the patent holder at the place where the infringing sale is made because the patent owner loses business there. This loss is immediate when the patent holder is marketing a competing product. Even if the patent holder is not, the loss may be no less real since the sale represents a loss in potential revenue through licensing or other arrangements. Furthermore, analysis of long-arm jurisdiction has its focus on the conduct of the defendant. Plaintiff's contacts with the forum—such as where the plaintiff resides—as a general proposition are not considered a determinative consideration.[30] Additionally, a focus on the place where the infringing sales are made is consistent with other areas of intellectual property law—it brings patent infringement actions into line with the rule applied in trademark[31] and copyright[32] cases.

■ As we observed earlier in connection with the stream of commerce theory, we believe a uniform body of Federal Circuit law in this area would clearly promote judicial efficiency, would be consistent with our mandate, and would not create undue conflict and confusion at the district court level. Accordingly we hold that, in a case such as this, the situs of the injury is the location, or locations, at which the infringing activity directly impacts on the interests of the patentee, here the place of the infringing sales in Virginia.[33]

We conclude that the 'tortious injury' requirement of subsection A.4 has been met. The 'act or omission outside this Commonwealth' requirement is likewise satisfied given our previous conclusion that defendants purposefully shipped the accused fan into Virginia through an established distribution channel.

■ This leaves the 'substantial revenue' requirement. We conclude that this requirement is also satisfied. It can be inferred from plaintiff's allegations that defendants, by making through distribution channels ongoing and continuous shipments into Virginia, have derived substantial revenue, at least in absolute terms, from sales in Virginia. Although it is uncertain whether these sales have been substantial in percentage terms, the statute does not require that. See Ajax Realty Corp. v. J.F. Zook, Inc., 493 F.2d 818, 821–22 (4th Cir.1972), cert. denied, 411 U.S. 966, 93 S.Ct. 2148, 36 L.Ed.2d 687 (1973). In Ajax, for example, which concerned the 'substantial revenue' requirement in a companion subsection of Virginia's long-arm statute dealing with causes of action based on a breach of warranty, a one-time sale which yielded gross revenue of $37,000 (representing only one-half of one percent of the defendant's total sales) was held to meet the requirement. Id. at 821–22. Similarly, in Jackson v. National Linen Service Corp., 248 F.Supp. 962 (W.D.Va.1965), a one-time sale which yielded gross revenue of $25,000 was held to meet the requirement even though the defendant's average annual sales for the period in question were between four and five million dollars. Id. at 963.

Furthermore, there is no requirement in subsection A.4 that the revenue derived have any connection to the pleaded causes of action. See Robinson, 699 F.Supp. at 1212. Royal derived revenue from the one-time sale referred to in the Lim Declaration.

---

**30.** See Keeton, 465 U.S. at 779–80, 104 S.Ct. at 1480–81; see also Rush v. Savchuk, 444 U.S. 320, 332–33, 100 S.Ct. 571, 579, 62 L.Ed.2d 516 (1980).

**31.** See, e.g., Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 218, 12 USPQ2d 1808, 1810 (1st Cir.1989); Tefal, S.A. v. Products Int'l Co., 529 F.2d 495, 496 n. 1, 189 USPQ 385, 385 n. 1 (3d Cir.1976); Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 639, 109 USPQ 438, 442 (2d Cir.), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956); Schieffelin & Co. v. Jack Co. of Boca, 725 F.Supp. 1314, 1319, 13 USPQ2d 1704, 1706 (S.D.N.Y.1989).

**32.** See, e.g., Arbitron Co. v. E.W. Scripps, Inc., 559 F.Supp. 400, 404 (S.D.N.Y.1983).

**33.** See also Loral Fairchild Corp. v. Victor Co. of Japan, 803 F.Supp. 626, 25 USPQ2d 1701 (E.D.N.Y.1992) (patentee, Loral Fairchild, sued Murata Machinery Ltd. of Japan, in Virginia district court under subsection A.4 of Virginia's long-arm statute. Loral Fairchild is a Delaware corporation with a principal place of business in New York and an unspecified 'presence' in Virginia. Id. at 628, 25 USPQ2d at 1701. The court concluded that all the requirements of subsection A.4 were met. Id. at 630, 25 USPQ2d at 1704.)

There is evidence in the record that this revenue was substantial given that the underlying sale represented something in the range of 3% of Royal's total sales in 1991.[34] This revenue is relevant even though it resulted from the sale of unrelated goods.

For all the foregoing reasons, we conclude that the requirements of subsection A.4 have been satisfied, and that defendants were subject to personal jurisdiction under Virginia's long-arm statute.[35]

## CONCLUSION

The judgment granting the motion to dismiss for lack of jurisdiction is reversed.

**REVERSED AND REMANDED**

---

**34.** That evidence shows that Royal had $10,000,000 in gross sales in 1991. Assuming that figure is correct, in dollar terms, the 3% figure represents $300,000.

**35.** *Gordonsville Industries, Inc. v. American Artos Corp.,* 549 F.Supp. 200 (W.D.Va.1982) is not necessarily at odds. In *Gordonsville,* a one-time sale which generated revenue of approximately $14,000 was determined not to meet the requirement. *Id.* at 203. However, it was also held that the exercise of jurisdiction would violate due process requirements. *Id.* Thus, the discussion pertaining to the requirements of Virginia's long-arm statute was unnecessary to the holding in the case.