**NUTRITION PHYSIOLOGY CORPORATION,**
Plaintiff,

v.

**ENVIROS LTD., Biotal Ltd., and Biotal, Inc., Defendants.**

No. Civ.A. 5:99CV0107–C.

United States District Court,
N.D. Texas,
Lubbock Division.

March 9, 2000.

Gregory V. Novak, Tracy W. Druce, Royston, Rayzor, Vickery, Novak & Druce, L.L.P., San Antonio, TX, for plaintiff.

James T. Nikolai, Nikolai, Mersereau & Dietz, P.A., Minneapolis, MN, Jerry M. Kolander, Jr., Fernando M. Bustos, McCleskey, Harriger, Brazill & Graf, Lubbock, TX, for Defendants.

### ORDER

CUMMINGS, District Judge.

On this day the Court revisited Defendants Enviros Ltd. ("Enviros"), Biotal Ltd., and Biotal, Inc.'s, Motion to Dismiss, filed July 2, 1999. Plaintiff, Nutrition Physiology Corporation ("NPC"), filed a Response to Defendants' Motion on July 22, 1999, to which Defendants filed a Reply on August 6, 1999. On October 28, 1999, the Court denied Defendants' Motion to Dismiss for failure to state a claim and for

insufficient service of process, ordered NPC to properly serve Defendants within sixty days, and ordered that a ruling on Defendants' challenge to personal jurisdiction, venue, and service of process would be held in abeyance until additional discovery could be conducted on the issues.

Thereafter, NPC filed a supplemental brief on December 28, 1999, to which Defendants filed a Response on January 12, 2000. No reply was permitted. After considering all relevant arguments and evidence, the Court **DENIES** Defendants' Motion to Dismiss for insufficient service of process; **GRANTS** Defendants' Motion to Dismiss claims against Biotal Ltd. for lack of personal jurisdiction and improper venue; and, upon request of NPC, **DISMISSES** without prejudice all claims against Enviros Ltd.

## I.

### BACKGROUND

NPC is a Texas corporation which is the owner by assignment of United States patents 5,529,793 (the '793 patent) and 5,534,-271 (the '271 patent) which are compositions and processes that seek to improve "the utilization of feedstuffs by ruminants." In essence, NPC's patents address the diet of ruminant animals, such as sheep and cattle, to increase meat or milk production, and in order that the animals might avoid potentially fatal indigestion when being converted from pasture feeding to feedlot diets. NPC's '793 patent describes a combination of bacteria and/or lactic acid to be mixed with the animal's diet so the animal might properly digest the high-starch content of a feedlot diet; the '271 patent states a process for improving the ruminants' diets by using bacteria mixtures.

Defendants Enviros Ltd. and Biotal Ltd. are corporations organized and based in the United Kingdom. Enviros Ltd. is the parent company of Biotal Ltd.; Biotal, Inc., a Minnesota corporation, is the subsidiary of Biotal Ltd. NPC brought suit against Defendants in this Court on April 14, 1999, alleging violations of 35 U.S.C. § 271, by claiming:

> Defendants have been and are currently willfully and wantonly infringing the '793 and '271 patents by making, having made, using, offering for sale, or selling products which embody the patented inventions and Defendants will continue to do so unless enjoined by the Court.

(parenthetical text omitted). Thereafter, Defendants filed a Motion to Dismiss, arguing in part that the Court does not possess personal jurisdiction over Biotal Ltd. and Enviros Ltd., that venue is improper, and that service of process on the Defendants is insufficient.

## II.

### MOTION TO DISMISS STANDARDS

*A. Standards for Lack of Personal Jurisdiction*

Motions filed under Rule 12(b)(2) of the Federal Rules of Civil Procedure seek to dismiss a complaint or a counterclaim for lack of personal jurisdiction. This motion to dismiss challenges the Court's jurisdiction over the person of the defendant. When personal jurisdiction is challenged, the plaintiff bears the burden of making a prima facie case by alleging facts in the complaint and affidavits sufficient to establish jurisdiction over the nonresident defendant. *Mink v. AAAA Dev. LLC,* 190 F.3d 333, 335 (5th Cir.1999). Uncontroverted allegations by the plaintiff must be taken as true. *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1565 (Fed.Cir.), *cert. dismissed,* 512 U.S. 1273, 115 S.Ct. 18, 129 L.Ed.2d 917 (1994). Conflicts in the facts alleged by the plaintiff must be resolved in the plaintiff's favor. *Caldwell v. Palmetto State Savs. Bank of S.C.,* 811 F.2d 916, 917 (5th Cir.1987). Because the Federal Circuit holds appellate jurisdiction over patent cases, personal jurisdiction is governed by Federal Circuit law, not by the law of the Fifth Circuit. *Viam Corp. v. Iowa Export–Import Trading Co.,* 84 F.3d 424, 427

(Fed.Cir.1996); *Beverly Hills Fan*, 21 F.3d at 1564–65.

A court, when examining a challenge to personal jurisdiction, must consider both statutory and constitutional issues. *Graphic Controls Corp. v. Utah Med. Prods., Inc.*, 149 F.3d 1382, 1384 (Fed.Cir. 1998). "Determining whether jurisdiction exists over an out-of-state defendant involves two inquiries: whether a forum state's long-arm statute permits service of process and whether assertion of personal jurisdiction violates due process." *Id.,citing Genetic Implant Sys., Inc. v. Core–Vent Corp.*, 123 F.3d 1455, 1457 (Fed.Cir. 1997). The first step in this inquiry examines the reach of the long-arm statute. The second step—the due process analysis—requires the satisfaction of two elements: (a) the non-resident must have some minimum contacts with the forum state which results from an affirmative act on the defendant's part; and (b) maintaining a suit over the non-resident defendant in the forum state must not offend "traditional notions of fair play and substantial justice."[1] *International Shoe v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Because Texas' long-arm statute is coextensive with the limits of due process, *see Holt Oil & Gas v. Harvey*, 801 F.2d 773, 777 (5th Cir.1986), the two inquiries coalesce into whether the exercise of personal jurisdiction over Enviros Ltd. and Biotal Ltd. is consistent with federal due process. *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 857 (Fed.Cir. 1999); *Viam Corp.*, 84 F.3d at 427.

### 1. Minimum Contacts

Minimum contacts is found when a defendant has "purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). When analyzing whether there are sufficient minimum contacts with a forum state, the court is to focus on the relationship among the non-resident defendant, the forum state, and the litigation at issue. *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). Jurisdiction is not proper when a defendant only has random, fortuitous, or attenuated contacts with the forum state, or due to the unilateral activity of another party or a third person. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). This standard helps ensure that non-residents have fair warning that a particular activity may subject them to litigation within the forum. *Beverly Hills Fan*, 21 F.3d at 1565.

### 2. Fair Play and Substantial Justice

Only if the nonresident defendant purposefully establishes minimum contacts with the forum state does the court consider whether maintenance of the suit comports with traditional notions of fair play and substantial justice. The following factors are to be considered in conducting this inquiry: (1) the burden upon the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interests in securing relief; (4) the interstate judicial system's interests in obtaining the most efficient resolution of controversies; and (5) the shared interests of the several States in furthering fundamental substantive social policies. *See Burger King*, 471 U.S. at 476–77, 105 S.Ct. 2174. The fairness factors cannot of themselves invest the court with jurisdiction over a nonresident when the minimum contacts analysis weighs against the exercise of jurisdiction. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

---

1. Because the present case arises under federal question jurisdiction, the Court must examine due process in light of the Fifth Amendment rather than the Fourteenth Amendment. *Akro Corp. v. Luker*, 45 F.3d 1541, 1544 (Fed. Cir.1995). The Federal Circuit has applied the same "minimum contacts" standard of *International Shoe* and its progeny to federal question cases. *Id.* at 1545; *North American Philips Corp. v. American Vending Sales, Inc.*, 35 F.3d 1576, 1580 (Fed.Cir.1994).

A defendant's contacts may give rise to either specific jurisdiction or general jurisdiction. In the Federal Circuit, specific jurisdiction exists when the plaintiff satisfies a three-prong test by showing (1) the defendant purposefully directed its activities at the forum state; (2) the plaintiff's claim arises out of those activities; and (3) assertion of personal jurisdiction over the defendant is "reasonable and fair." *Akro*, 45 F.3d at 1545–46. On the other hand, a court is vested with general jurisdiction when fairness is shown and when the defendant's contacts with the forum state are both "continuous and systematic," even though the defendant's contacts with the state may not relate to the plaintiff's cause of action. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

## B. Venue Standards

Venue relates to the locality in which a lawsuit may be properly brought. *Minnesota Min. & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1264 (Fed.Cir.1985), *citing Neirbo v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 167–68, 60 S.Ct. 153, 84 L.Ed. 167 (1939). The purpose of a venue requirement is to protect defendants from being forced to defend lawsuits in a court remote from their residence or from where the acts underlying the controversy occurred. *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 84 F.3d 1408, 1410 (Fed. Cir.1996). The court is to determine whether venue properly existed at the time the plaintiff's complaint was filed. *Hoffman v. Blaski*, 363 U.S. 335, 342–44, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960).

In patent infringement suits, venue is governed by 28 U.S.C. § 1400(b), which states:

> Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business.

The U.S. Supreme Court has held that § 1400(b) is the sole and exclusive provision governing venue in patent infringement actions. *Fourco Glass Co. v. Transmirra Prod. Corp.*, 353 U.S. 222, 229, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957). After amendments were made in 1988 to 28 U.S.C. § 1391, another venue statute, the Federal Circuit in *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1583–84 (Fed.Cir.1990), held that the definition of "where the defendant resides" in § 1400(b) should be determined according to the guidelines set out in 28 U.S.C. § 1391(c). Section 1391(c) states in relevant part:

> For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced....

As such, this Court should find that venue is proper if it finds it properly maintains personal jurisdiction over Enviros Ltd. and Biotal Ltd.

## C. Standards for Service of Process

Federal Rule of Civil Procedure 12(b)(5) permits defendants to challenge the method of service attempted by the plaintiff. In patent infringement cases, federal law provides for two methods of service. Nonresident defendants who maintain a regular and established place of business may be served pursuant to 28 U.S.C. § 1694. Service on alien patentees in suits relating to that patent or the rights thereunder is effected according to the guidelines of 35 U.S.C. § 293.

In all other instances, when attempting to effect service of process on defendants in a foreign country, parties typically look to the requirements of Rule 4(f), Federal Rules of Civil Procedure. This rule allows service to be made in three ways: (1) by any internationally agreed means, such as the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ("Hague Convention"); (2) if there

is not an internationally agreed means, or if the applicable international agreement allows other means of service, by a number of ways reasonably calculated to provide notice; or (3) by any other means not prohibited by international agreement, if directed by the court.

## III.

## DISCUSSION

### A. NPC's Motion to Dismiss Claims Against Enviros Ltd.

The Court begins by noting that NPC now wishes to dismiss without prejudice all claims against Enviros Ltd. "as it appears to be merely a venture capital group without continuous and systematic contacts with this forum." Under Rule 41(a)(1), Federal Rules of Civil Procedure, NPC is entitled to voluntarily dismiss an action at any time by filing a notice of dismissal at any time before the adverse party's answer. The Court has not received a notice of dismissal by NPC, but nevertheless **DISMISSES WITHOUT PREJUDICE** all claims against Enviros Ltd., pursuant to Rule 41(a)(2). Furthermore, the Court **DENIES AS MOOT** Defendants' Motion to Dismiss claims against Enviros Ltd.

### B. Improper Service of Process upon Biotal Ltd.

The Court next addresses Defendants' Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(5) regarding the sufficiency of service upon Biotal Ltd. Because NPC has now properly served this Defendant as ordered by the Court, the Court **DENIES** Defendants' Motion to Dismiss for improper service of process.

### C. Personal Jurisdiction over Biotal Ltd.

Defendants move to dismiss claims against Biotal Ltd. because NPC has failed to show this Court properly maintains personal jurisdiction over that Defendant. Biotal Ltd. contends that it has never engaged in acts in Texas which relate to NPC's patent infringement claims, nor has it engaged in any other conduct that should enable it to be haled into court in Texas. Biotal Ltd. argues, therefore, that NPC can establish neither specific nor general jurisdiction over it and that the exercise of personal jurisdiction over it offends traditional notions of fair play and substantial justice.

In its Response to Defendants' Motion to Dismiss, NPC argues that Texas is a proper forum state over NPC's claims against Biotal Ltd. because: (1) Biotal Ltd.'s maintenance of an "interactive web site" is sufficient to establish minimum contacts; (2) Biotal Ltd. has targeted Texas with advertising materials; (3) Biotal Ltd. actively oversees and coordinates the research, development and marketing of Biotal, Inc.'s products, and should be amenable to personal jurisdiction under the "stream of commerce" doctrine; and (4) Biotal Ltd. is amenable to personal jurisdiction because the Court maintains personal jurisdiction over Biotal, Inc., Biotal Ltd.'s wholly owned subsidiary. After reviewing the available evidence, this Court disagrees with NPC's position and finds that the Court does not possess personal jurisdiction over Biotal Ltd.

### 1. Biotal Ltd.'s Web Site

Biotal Ltd. maintains a web site [2] on the Internet (*www.biotal.co.uk/*) which, at all times relevant to this lawsuit, welcomed visitors "to the Home Page [3] of

---

**2.** A web site is a collection of computer files and documents available for access on the World Wide Web. RANDOM HOUSE WEBSTER'S COMPUTER & INTERNET DICTIONARY 606 (1999) (hereinafter RANDOM HOUSE WEBSTER'S). The World Wide Web is a system of Internet servers which makes specifically formatted documents available to computer users. *Id.* at 617. The Internet is a network of millions of computers which forms the infrastructure for worldwide access to the World Wide Web. *Id.* at 283.

**3.** A home page serves the main screen of a web site which typically provides an index or table of contents to other documents stored at the web site. RANDOM HOUSE WEBSTER'S, *supra* note 2, at 239.

Biotal Limited." The web site describes the company as "market leaders in the development of products based on microbes and enzymes to replace aggressive, and often potentially harmful, chemicals for agricultural and industrial & consumer applications." Within a section devoted to agricultural products available in North America, the web site includes a description of Micro–Cell for Beef and Micro–Cell for Dairy, two feed-additive products using bacteria and/or lactic acid which appear to form the basis of NPC's patent infringement claims. At the end of that section, visitors who are interested in more details on the products are instructed to "contact your local Biotal Distributor or: Vince Myerly[,] Biotal Inc." The web site underlines the name of Vince Myerly, possibly indicating a hyperlink[4] to an electronic mail[5] address so that visitors can request more information about the agricultural products.

The United States Supreme Court noted that "[a]s technological progress has increased the flow of commerce between States, the need for jurisdiction has undergone a similar increase." *Hanson,* 357 U.S. at 250–51, 78 S.Ct. 1228. Given the escalating popularity of the Internet over the last few years, the Federal Circuit has only recently discussed the effect of a corporation's web site upon personal jurisdiction questions. In 1998, the Federal Circuit held that a web site which provides general information about a company and its products and which forwards e-mail responses to a subsidiary is insufficient in itself to establish personal jurisdiction in a forum state in which the defendant is not a resident. *3D Sys. Inc. v. Aarotech Labs., Inc.,* 160 F.3d 1373, 1380 (Fed.Cir.1998).

The Federal Circuit relied in part upon the Ninth Circuit's discussion of the pertinence of web sites upon minimum contacts questions in *Cybersell, Inc. v. Cybersell, Inc.* 130 F.3d 414, 415 (9th Cir.1997). In

that case, an Arizona corporation brought suit against a Florida corporation under the same name, alleging that the Florida corporation infringed on its use of a service mark when advertising for services on the Internet. The Florida corporation's web site invited companies interested in advertising on the World Wide Web to "Email us to find out how!" *Id.* at 416. Upon being sued by the Arizona corporation in the U.S. District Court for the District of Arizona, the Florida corporation moved to dismiss the lawsuit for lack of personal jurisdiction. *Id.* When the district court dismissed the case, the Arizona corporation appealed to the Ninth Circuit.

In affirming the dismissal of the lawsuit on personal jurisdiction grounds, the Ninth Circuit discussed the distinction between "passive" and "interactive" web sites. *Id.,* at 417–18. Passive web sites contain general information about a business as well as a phone number and address visitors could use if they wished to place an order or receive more information. No orders are received over the Internet. *Id.* at 417. On the other hand, interactive web sites enable visitors to "exchange information with the host computer" so that data such as credit card information can be sent directly to the company providing goods or services. *See id., citing Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119, 1124 (W.D.Pa.1997). Unlike interactive web sites, passive web sites, without "something more," are insufficient "to indicate that the defendant purposefully (albeit electronically) directed his activity in a substantial way to the forum state." *Cybersell,* 130 F.3d at 418.

This Court finds the reasoning of *Cybersell* and *Aarotech* to be relevant in the case at bar, and finds that Biotal Ltd.'s passive web site is insufficient to establish personal jurisdiction in Texas. The evi-

---

**4.** A hyperlink is a cross-reference in an electronic document that, when activated, takes the user to another place in the same document or to an entirely different document. RANDOM HOUSE WEBSTER'S, *supra* note 2, at 317.

**5.** E-mail, or electronic mail, is a system for transmitting and receiving messages electronically over communication networks. RANDOM HOUSE WEBSTER'S, *supra* note 2, at 190.

dence indicates that the web site does not allow viewers to order information over the Internet; e-mail messages may be sent by viewers to request further information. There is no evidence to establish that Biotal Ltd. made any sales in Texas through its web site, that it exchanged any money or services from or through Texas, or that it has consummated any form of business transaction remotely relating to Texas other than possibly forwarding e-mail messages to a subsidiary. Therefore, the existence of Biotal Ltd.'s web site is insufficient to establish that Biotal Ltd. purposefully availed itself of the privilege of conducting business in Texas.[6]

### 2. Advertising and Product Packaging in Texas

■ In its Response to Defendants' Motion to Dismiss, NPC argues that Biotal Ltd. has established minimum contacts with Texas by mailing sales brochures into the state. While it did not provide evidence of advertisements Biotal Ltd. targeted at Texas, NPC argues in its Response: "Logic dictates that an international conglomerate selling livestock and agricultural products would target Texas, with its wealth of ranches and farms, as a desirable and anticipated market." Even after the Court granted the parties sufficient time for discovery, however, NPC has failed to present evidence of sales brochures targeted at the forum state. Logic may be one thing; relevant evidence is another. Having failed to provide evidence of a single sales brochure sent into Texas, the Court finds it would be illogical to find that minimum contacts have been satisfied on this basis.

■ In its Supplemental Brief, NPC also proffers that the minimum contacts test is satisfied because the packaging for Micro–Cell products indicate they are made for both Biotal Ltd. and Biotal, Inc.

The Court disagrees with NPC's assertion. The Federal Circuit held in *Aarotech* that the existence of a passive web site and the defendant's name on its subsidiary's letterhead is insufficient to establish minimum contacts with the forum state, even when the plaintiff in that case was able to show that the letterhead reached the forum state. 160 F.3d at 1380. In the present case, NPC has failed to point out why the Court should find the reasoning in *Aarotech* to be distinguishable or to show that such packaging ever reached Texas. As such, this evidence does not support NPC's conclusion that Biotal Ltd. established sufficient minimum contacts with Texas.

### 3. Line of Corporate Control

■ The Court also finds that it does not possess personal jurisdiction over Biotal Ltd. merely because it maintains jurisdiction over Biotal, Inc. In *Aarotech*, the Federal Circuit declined to pierce the corporate veil of a parent company which did not otherwise maintain personal jurisdiction in the forum state, holding that courts are not to "lightly cast aside" the corporate form because of the actions of the subsidiary. *Aarotech* at 1380, *quoting Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 552 (Fed.Cir.1990) (in deciding whether to pierce the corporate veil, "[t]he court, however, must 'start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception' ... [or] unless there is at least 'specific intent to escape liability for a specific tort....' ") (internal citations omitted).

While the Federal Circuit failed to address what "specific, unusual circumstances" would justify a finding of personal jurisdiction over the parent company due to its subsidiary's conduct, both sides cite

**6.** The Court's finding today is also consistent with the Fifth Circuit's recent approach to addressing personal jurisdiction disputes in which minimum contacts with the forum state are argued to be established due to the defendant's web site: web pages that provide nothing more than a mail-in order form, e-mail address, or toll-free phone number are passive advertisements, and are therefore insufficient grounds for exercising personal jurisdiction. *Mink*, 190 F.3d at 336 (adopting the reasoning of *Zippo* ).

to the Fifth Circuit opinion in *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir.1983), in support of their respective positions. In *Hargrave*, the Fifth Circuit enumerated five factors to consider in determining whether a parent company can be held amenable to personal jurisdiction due to the acts of its subsidiary: (1) amount of stock owned by the parent of the subsidiary; (2) existence of separate headquarters of the two companies; (3) common officers and directors; (4) observation of corporate formalities; (5) maintenance of separate accounting systems; (6) exercise of general policy of the subsidiary; (7) exercise of authority over daily operations of the subsidiary. While this case is not binding, the Court finds that *Hargrave* provides some guidance on the question and therefore examines the evidence to determine whether NPC has satisfied its burden of showing that personal jurisdiction is proper as a result of the close relationship between Biotal Ltd. and Biotal, Inc.

The Court begins by noting that Biotal, Inc. is wholly owned by Biotal Ltd.[7] and that two individuals serve as officers or directors with both companies. Despite these facts, the evidence militates against the Court finding that NPC has satisfied the *Hargrave* test. For example, Plaintiff cites to testimony of Gerald Higgs, chief financial officer of Biotal Ltd., as evidence that the group of companies under the Biotal umbrella can be characterized as an "amorphous lump" or "tangled web," and that Biotal Ltd. performs group-accounting functions for the other companies in the group. The Court finds, however, that much of the Plaintiff's evidence is taken out of context from Higgs' full testimony.

Despite NPC's selective use of ellipses in quoting Higgs' testimony in its Supplemental Brief, the utilization of group-accounting techniques does not denote that Biotal Ltd. and Biotal, Inc.'s accounting systems are not "separate." In the words of Higgs, during the group-accounting process, the funds from the companies remain distinct and separate;[8] rather, "we pull together all the *results* of those companies [in the Biotal group]. I prepare what is called consolidated accounts and report, as we do in the statutory accounts ... one global headline sales figure, one margin, one overhead, one net profit." (Emphasis added).

Higgs stresses that the companies in the group, including Biotal, Inc., maintain distinct cost and profit centers and are independently responsible for daily operations, including accounting, or that Biotal Ltd. is somehow responsible for maintaining Biotal, Inc.'s financial records. NPC also

---

**7.** The Court notes that despite its use of the words "parent" and "subsidiary" to refer to Biotal Ltd. and Biotal, Inc., respectively, the evidence is unclear whether the relationship is parent/subsidiary or holding company/affiliate. This determination is not relevant in applying the *Hargrave* test, however, as the relationships are considered to be analogous when making alter ego determinations. *See Applewhite v. Metro Aviation, Inc.*, 875 F.2d 491, 498 n. 8 (5th Cir.1989).

**8.** Despite NPC's characterization of the evidence in its Supplemental Brief, the Court notes that it appears clear from the evidence that counsel for NPC understood the group accounting process as not involving the commingling of funds. In NPC's deposition taken of Higgs, he clarifies the processes of the group accounting system:

A: When I say I prepare group accounts, all I do is get four sets of numbers, four sets of sales figures, and add them up on a sheet of paper and that's a consolidated account. The consolidated account is not a legal entity as such, yes? If you went somewhere like ICI, a big company, they have one shell company and it makes it—It would be much better for me accounting-wise if we had a little subsidiary company and everything came into it; it would make accounting a lot easier. That's the difference.

Q: That makes sense to me. Now I understand.

A: Yes.

Q: So you have four groups and you lump it all together and then you go from there. But the lumping it all together is not what we would typically understand as some holding company which gets all the funds funneled through?

A: Correct.

Q: Okay. Now that makes sense to me.

presents no evidence that Biotal Ltd.'s group-accounting practice is irregular or unusual in a manner that might compel the Court to find that maintenance of personal jurisdiction in Texas is necessary to prevent fraud. Rather, the available evidence is clear that despite Biotal Ltd.'s analyzing the Biotal group's results on one consolidated statement, Biotal, Inc. and Biotal Ltd. maintain separate accounting systems. The Court finds that the available evidence regarding the accounting practices of Biotal Ltd. and Biotal, Inc. actually supports a finding that the two companies are not alter egos.

Plaintiff finally attempts to convince this Court that Biotal Ltd. is amenable to personal jurisdiction because Higgs "Holds the Intellectual Property Portfolios of the [Biotal] Group." The evidence, however, only suggests that Higgs has knowledge of the intellectual property holdings of companies in the group and that he is responsible for keeping a "holding brief on patents and trademarks." Despite NPC's assertions, nothing in the evidence indicates that Higgs or Biotal Ltd. actually possesses the intellectual property interests in Biotal, Inc. or has the ability to direct how they are used. The Court further finds that Biotal, Inc. has been the registered owner of the trademark for Micro–Cell since 1996, and Biotal Ltd. has no rights to those interests.[9] Even though the companies exchange technical information and advice on occasion, the Court does not find that this evidence is sufficient to satisfy the Plaintiff's burden under the *Hargrave* test.

On the basis of the evidence carefully reviewed by this Court, the Court finds that NPC has failed to satisfy its burden of showing that Biotal Ltd. has made sufficient contacts with the state of Texas, or providing specific, unusual circumstances that would justify a finding of personal jurisdiction over Biotal Ltd. under an alter

ego theory. Furthermore, NPC failed to show that Biotal Ltd.'s relationship with its subsidiary is sufficient under *Hargrave* for the Court to find that Biotal Ltd. should be held amenable to personal jurisdiction in Texas due to the acts of Biotal, Inc. For these reasons, Defendants' Motion to Dismiss claims against Biotal Ltd. for lack of personal jurisdiction is **GRANTED.**

*D. Improper Venue*

Because the Court finds no evidence of Biotal Ltd.'s committing regular acts of infringement or maintaining a regular and established place of business in Lubbock, Texas, and because it has previously found that it does not possess personal jurisdiction over Biotal Ltd., the Court finds that venue is improper in the Northern District of Texas, Lubbock Division. See 28 U.S.C. § 1400(b). Therefore, Defendants' Motion to Dismiss claims against Biotal Ltd. for improper venue is **GRANTED.**

**IV.**

**CONCLUSION**

For the reasons stated above, this Court **DISMISSES** without prejudice all claims against Enviros Ltd. and **DENIES AS MOOT** Defendants' Motion to Dismiss claims against that Defendant. The Court further **DENIES** Defendants' Motion to Dismiss for insufficient service of process on Biotal Ltd. and **GRANTS** Defendants' Motion to Dismiss claims against Biotal Ltd. for want of personal jurisdiction and for improper venue.

All relief not expressly granted is denied.

SO ORDERED.

---

9. Biotal Ltd. acknowledges it at one time had begun to pursue a trademark for Micro–Cell but had abandoned the application. There is no evidence that Biotal Ltd. has ever attempted to exert any control over the Micro–Cell trademark since that time.