**HUNTER ENGINEERING COMPANY Plaintiff,**

v.

**ACCU INDUSTRIES, INC., G.S. S.R.L., Snap–On Incorporated, and Equipment Services, Inc., Defendants.**

**No. CIV.3:02CV333.**

United States District Court,
E.D. Virginia,
Richmond Division.

Oct. 10, 2002.

Brian Charles Riopelle, McGuireWoods LLP, Richmond, Russell E. Levine, Garret A. Leach, Nyika O. Prendergast Strickland, Kirkland & Ellis, Chicago, IL, for Hunter Engineering Company, plaintiff.

Dana Johannes Finberg, McCandlish Holton, Richmond, Brady J. Fulton, Sally Wiggins, Joseph Nevi Hosteny, III, Niro Scavone Haller & Niro, Chicago, IL, for ACCU Industries, Inc., G.S. S.R.L., IDSC Holdings, Inc., Snap–On Incorporated, Equipment Services, Inc., defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

Hunter Engineering Company ("Hunter"), a Missouri corporation with its principal place of business in Bridgeton, Missouri, holds a number of patents on components of wheel alignment systems that service stations use to align the wheels of automobiles. In its First Amended Complaint, Hunter alleges that defendants, G.S. S.r.l. ("G.S.") and Equipment Services. Inc. ("Equipment Services") manufacture products that infringe two of Hunter's patents. G.S., an Italian corporation (wholly owned by defendant Snap–On, Inc.) with its principal place of business in Corregio, Italy, distributes its products in the United States through defendant ACCU Industries, Inc., a Virginia corporation with its principal place of business in Ashland, Virginia. Equipment Services, a Delaware corporation with its principal place of business in Conway, Arkansas, distributes its product in conjunction with its parent company, defendant Snap–On, Incorporated, a Delaware corporation with its principal place of business in Pleasant Prairie, Wisconsin.

Pursuant to 28 U.S.C. § 1404(a), the defendants have moved that this action be transferred to the Eastern District of Wisconsin, where related litigation between Hunter and Snap–On is pending. For the reasons set forth below, the motion to transfer venue to that court is granted.

## STATEMENT OF FACTS

On May 20, 2002, Hunter filed this action alleging that certain products manufactured or distributed by the defendants infringe Hunter's U.S. Patent Number 4,594,789 ("'789 patent") and U.S. Patent Number 5,018,853 ("'853 patent"). The '789 patent covers a wheel alignment system that uses photodetector arrays to measure wheel angle. The '853 patent covers an angle sensor with linear charge coupled device for a wheel alignment system.

The present action is but one aspect of a larger dispute between Hunter and Snap–

On in which each company contends that the other infringes a number of its patents associated with computerized wheel alignment technology used by service stations around the country to align the wheels of automobiles. A brief history of the patent infringement litigation between Hunter and Snap–On is necessary to resolution of the motion to transfer venue.

In 1998, Snap–On filed suit in the Alexandria Division of the Eastern District of Virginia against Hunter and four Virginia service stations. On April 10, 1998, upon Hunter's motion, Judge Brinkema transferred that action to the Eastern District of Wisconsin, citing the fact that most witnesses to the action were located in the mid-western United States, and that the Virginia service stations were only tangentially related to the underlying claim. The claims against the Virginia service stations were severed and not transferred. The record does not disclose what has since happened to the severed claims.

Five days later, April 15, 1998, Hunter filed an action against a Snap–On subsidiary in the Eastern District of Missouri seeking a declaratory judgment on the invalidity and/or non-infringement of the patents at issue in the action that Judge Brinkema had transferred to Wisconsin. On May 26, 1998, Hunter asked the Wisconsin Court to transfer to Missouri the action that Judge Brinkema had transferred to Wisconsin. On August 10, 1998, the Missouri Court transferred to the Eastern District of Wisconsin the action that Hunter had filed in Missouri on April 15, and, on December 3, 1998, the Wisconsin Court denied the motion to transfer to Missouri the action that Judge Brinkema had transferred to Wisconsin.

On June 30, 2000, Snap–On filed a third action against Hunter in the Eastern District of Wisconsin alleging infringement of two additional related patents to be consolidated with the action pending in Wisconsin. On August 28, 2000, Hunter filed in Missouri a fourth action against a Snap–On subsidiary alleging infringement of two additional wheel alignment patents. As before, the Missouri Court transferred the suit to the Eastern District of Wisconsin.

Consequently, all litigation between Hunter and the various Snap–On entities relating to wheel alignment patents (consisting of twenty-two computerized wheel alignment and wheel balancing patents) was pending in the Eastern District of Wisconsin when this action was filed. Judge Adelman, who presides over those actions in the Eastern District of Wisconsin, has consolidated them and has invested significant judicial resources in resolving the patent disputes at issue there.

For example, starting in April 1999, the parties pursued litigation of four of the twenty-two patents in the Wisconsin Court before achieving settlement as to those four patents. In January 2000, Judge Adelman retained a court expert, Professor Nard, who since has spent over 560 hours reviewing the unique legal issues in the case at a cost to the parties to date of over $80,000. After a failed mediation attempt in the summer of 2000 concerning the remaining patents, the parties briefed the claim construction of the remaining eighteen patents in suit. This significant effort concluded in August 2001, at which time Judge Adelman decided to construe the claims relating to six of the patents (so-called "accelerated patents") and to stay action on the remaining twelve.[1] In

1. Judge Adelman asked each side to submit two of their own patents and one of their opponent's patents. Accordingly, each side submitted three patents to be considered yielding a total of six accelerated patents. The parties have not described with particu-

February 2002, Judge Adelman issued a lengthy, detailed opinion construing the six accelerated patents. The parties since have reached settlement on two of the six accelerated patents, and Judge Adelman set October 14, 2002 to begin the trial on the remaining four accelerated patents. Judge Adelman recently moved the trial date to October 30, 2002.

This action involves patents that relate to the same wheel alignment technology at issue in the actions now consolidated in Wisconsin. Hence, Hunter alleges that Equipment Services' new Visualiner CCD-based alignment sensors and G.S.-manufactured/Accu-distributed Accu–Turn sensors violate Hunter's '789 and '853 patents.[2] Although these particular patents are not at issue in the Wisconsin litigation, at least one of the allegedly infringing products here—Equipment Services' Visualiner—also allegedly infringes some patents at issue in the Wisconsin action. Moreover, the technology at issue in this action relates to components of a computerized wheel alignment system, as does the technology at issue in the Wisconsin action.

Notwithstanding the admitted similarity of the products at issue here and the products in the Wisconsin action, the parties sharply disagree as to the extent to which resolution of the patents in suit here would affect resolution of the patents in suit in Wisconsin, and vice versa. Hunter argues that the products are functionally separate and adjudication of one action will not affect adjudication of the other. Specifically, the accused products here are sensors, while the accused product in Wisconsin is software; and, says Hunter, if this Court finds that sensors infringe Hunter's patents, Snap–On can simply use other sensors and still infringe the software patents at issue in Wisconsin. At oral argument, counsel for the defendants called this characterization a "gross over-simplification" and noted that the manner in which the processor receives data from the sensors involves elements of the accused software. *See* September 25, 2002 Transcript at 64.

It is undisputed that the parties to this action are not all the same as the parties in the Wisconsin action. Specifically, neither G.S. nor ACCU are parties to the Wisconsin actions. However, both ACCU and G.S. have significant contacts with the state of Wisconsin. ACCU, the exclusive American distributor for G.S., has targeted Wisconsin as a geographic market since 1984 and many end-users there have purchased products distributed by ACCU, including the allegedly infringing Accu–Turn aligner. G.S. has conducted a significant amount of business with Wisconsin companies, and through ACCU, it placed one of its infringing products in Wisconsin.

The defendants have requested a transfer of venue to the Eastern District of Wisconsin under 28 U.S.C. § 1404(a), arguing that: (1) the convenience to witnesses favors transfer there; (2) the midwestern United States is the "center of activity" for the facts involved in this action; and (3) the Wisconsin Court's substantial investment of resources strongly

---

larity the effect of that order on new claims relating to patents not previously in issue. Both sides imply that had this action been filed initially in the Wisconsin Court, that Court would consolidate it with the pending actions, and stay action on its claims until the conclusion of the October trial on the four remaining accelerated patents.

**2.** Hunter alleges that Equipment Services began marketing the Visualiner in mid–2001. Neither Hunter nor the defendants have proffered any evidence indicating when the Accu–Turn sensors hit the market.

augers in favor of transfer. Hunter responds that: (1) this action is significantly different from the Wisconsin actions; (2) there is a substantial connection to this district; and (3) transfer will prejudice Hunter insofar as this action is likely to be resolved much more quickly here than in Wisconsin.

## DISCUSSION

A United States District Court has the discretion to transfer a civil action to a more appropriate forum. Section 1404(a) of United States Code Title 28 governs such transfers and provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Courts have interpreted this provision to require that the moving party prove that: (1) the plaintiff could have originally brought the action in the transferee forum; and (2) the interests of justice favor such a transfer. *See Corry v. CFM Majestic Inc.*, 16 F.Supp.2d 660, 663 (E.D.Va.1998); *Verosol v. Hunter Douglas, Inc.*, 806 F.Supp. 582, 592 (E.D.Va.1992). Only where the moving party has proved these elements may a district court transfer venue under § 1404(a). *See Corry*, 16 F.Supp.2d. at 663. To each of those issues, it is time to turn.

## I. Where The Action "Might Have Been Brought"

The Supreme Court of the United States has interpreted narrowly the phrase "where [the action] might have been brought" in 28 U.S.C. § 1404(a) to limit a defendant's ability to defeat the plaintiff's choice of forum. In *Hoffman v. Blaski*, 363 U.S. 335, 343–44, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960), the Court held that appropriate transferee fora are only those where the plaintiff could have brought the

action initially, disregarding entirely the defendant's ability to waive both personal jurisdiction and venue. And, in *Hoffman*, the Supreme Court made clear that "the power of a District Court under § 1404(a) to transfer an action to another district is made to depend *not upon the wish or waiver of the defendant but, rather, upon whether the transferee district* was one in which the action *'might have been brought'* by the plaintiff." *Id.* (emphasis added).

Commentators have criticized the rule in *Hoffman*, and the Supreme Court itself has limited the rule in subsequent cases. *See generally*, 17 James Wm. Moore et al., Moore's Federal Practice § 111.12[1][c] (3d ed.1998) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) and *Continental Grain Co. v. Barge FBL–585*, 364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960)). Nevertheless, the fundamental precept of *Hoffman* continues to supply the rule where the issue is whether the transferee court has personal jurisdiction over the defendants absent waiver. *See* 17 Moore's Federal Practice § 111.12[1][c]. Thus, lower courts routinely refuse to transfer venue if personal jurisdiction is lacking in the transferee forum. *See e.g., Corry v. CFM Majestic Inc.*, 16 F.Supp.2d 660 (E.D.Va.1998).

*Corry* presented a motion to transfer much like the one presented here, and, following *Hoffman*, the Court there denied the motion to transfer. *See id.* at 663–64. In *Corry*, a patentee brought suit against a licensee alleging patent infringement along with other claims. In order to bring the action in the Eastern District of Virginia, the plaintiff sued one of the licensee's distributors who had a minimal presence in the district and no presence in the transferee forum. *See id.* at 661. Citing *Hoffman*, the Court declined to transfer the claim against the distributor because the

transferee forum lacked personal jurisdiction over the distributor. *See id.* at 663–64; *see also Brown Manufacturing Corp. v. Alpha Lawn & Garden Equipment, Inc.,* 2002 WL 2008186 (E.D.Va.).

Neither party disputes that the Wisconsin Court has jurisdiction over Snap–On and Equipment Services. Thus, the critical issue is whether the Wisconsin Court has personal jurisdiction over ACCU and G.S.[3] The ensuing assessment proceeds mindful of the facts that neither ACCU nor G.S. is a Wisconsin corporation and that neither maintains its principal place of business there. As noted previously, ACCU is a Virginia corporation headquartered in Ashland, VA, and G.S. is an Italian corporation headquartered in Corregio, Italy. Since neither is a citizen of, or has its principal place of business in, Wisconsin, they are non-residents; therefore, the Wisconsin Court can exercise personal jurisdiction over them only if the requirements of the Wisconsin long-arm statute, *see* Fed.R.Civ.P. 4(k)(1)(A), and federal due process are satisfied. *See Deprenyl Animal Health, Inc. v. University of Toronto Innovations Foundation,* 297 F.3d 1343, 1349–50 (Fed.Cir.2002).

Wisconsin courts have held that the Wisconsin long-arm statute "is to be liberally construed in favor of exercising jurisdiction and is intended to confer jurisdiction to the full extent allowed by due process." *PKWare, Inc. v. Meade,* 79 F.Supp.2d 1007, 1012 (E.D.Wis.2000) (citing *Johnson Worldwide Assoc., Inc. v. Brunton Co.,* 12 F.Supp.2d 901, 906 (E.D.Wis.1998)). Some courts applying the long-arm statute have concluded, therefore, that in satisfying federal due process requirements, a court

necessarily satisfies the Wisconsin long-arm statute. *See e.g., Allen–Bradley Co. v. Datalink Technologies, Inc.,* 55 F.Supp.2d 958, 959–60 (E.D.Wis.1999). While this may be true as a practical matter, the Wisconsin long-arm statute does not extend to the full reaches of due process by its own terms. As a result (and perhaps only in a very small subset of cases), due process may allow the exercise of personal jurisdiction while the Wisconsin long-arm statute could not be fairly construed to extend so far. Moreover, Wisconsin courts continue to require satisfaction of the Wisconsin long-arm statute in assessing personal jurisdiction. *See Dorf v. Ron March Co.,* 99 F.Supp.2d 994 (E.D.Wis.2000); *State ex rel. N.R.Z. v. G.L.C.,* 152 Wis.2d 97, 104, 447 N.W.2d 533, 535 (1989). Therefore, the traditional two-step inquiry is in order here.

### A. The Wisconsin Long–Arm Statute

ACCU and G.S. assert that two provisions of the Wisconsin long-arm statute[4] apply to confer personal jurisdiction over them in Wisconsin. First, they say that both corporations are amenable to jurisdiction under § 801.05(1)(d), which provides that:

> (1) In any action whether arising within or without this state, against a defendant who when the action is commenced: ... (d) Is engaged in substantial and not isolated activities within this state, whether such activities are wholly interstate, intrastate, or otherwise.

Second, it is asserted that ACCU is subject to jurisdiction under § 801.05(3) which provides that the exercise of jurisdiction is

---

**3.** Subject matter jurisdiction over patent infringement claims is appropriate in all federal courts, so subject matter jurisdiction is not an issue. *See* 28 U.S.C. § 1338. Since at least one of the defendants maintains its principal

place of business in the Eastern District of Wisconsin, venue is appropriate in the Wisconsin Court. *See* 28 U.S.C. § 1400(b).

**4.** Wis. Stat. § 801.05 (2002).

appropriate "[i]n any action claiming injury to person or property within or without this state arising out of an act or omission within this state by the defendant."

### 1. Personal Jurisdiction Over ACCU Under Section 801.05(3)

██ According to the defendants, ACCU is subject to § 801.05(3) because a company in Wisconsin purchased one of the allegedly infringing products. The Federal Circuit has decided that, as a matter of uniform patent law, "the situs of the injury [in patent infringement actions] is the location, or locations, at which the infringing activity directly impacts on the interests of the patentee." *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1566 (Fed.Cir.1994) (rejecting a previous decision holding that the situs of patent infringement injury is the situs of the intangible property interest—i.e., where the owner resides). This is so, explained the Federal Circuit, because the "[e]conomic loss occurs to the patent holder at the place where the infringing sale is made because the patent owner loses business there." *Id.* The Federal Circuit then applied that principle to find that the Chinese manufacturer, and the New Jersey distributor, of an infringing product committed torts in Virginia because Virginia was where the products were sold. *See id.* Under uniform patent law, therefore, the seller of an infringing product commits a tort in every state where its infringing product is sold.[5]

Neither party disputes that at least one of ACCU's allegedly infringing products was sold in Wisconsin. ACCU sold the product to its regional distributor in

Minnesota who, in turn, and with ACCU's expectation, sold the product to a company in Wisconsin. A forum state may assert "personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." *World–Wide Volkswagen v. Woodson,* 444 U.S. 286, 297–98, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The Federal Circuit has decided that this requires that the corporate defendant "know the likely destination of the products." *Beverly Hills Fan Co.,* 21 F.3d at 1566. Thus, specific knowledge exists if the sale "is not simply an isolated occurrence, but arises from the efforts of the [defendants] to serve, directly or indirectly the market for its product." *Beverly Hills Fan Co.,* 21 F.3d at 1566 (quoting *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559).

The record shows that ACCU targeted Wisconsin as an object of its marketing for twenty years before the sales at issue here and that it has sub-distributors that service the Wisconsin market. ACCU also has contracted with two service centers in Wisconsin to accomplish repairs of its products there. On the record, then, it is rather clear that ACCU had every expectation that its products would be purchased by consumers in the state of Wisconsin.[6] Hence, ACCU is subject to specific jurisdiction under § 801–05(3).

### 2. Personal Jurisdiction Over ACCU Under Section 801.05(1)(d)

The defendants further argue that, wholly apart from the applicability of

---

5. Due Process might not allow courts in each state where the product was sold to exercise personal jurisdiction over the infringer, but the defendant commits a tort there nonetheless.

6. Hunter alleges that the "stream of commerce" doctrine used by ACCU and G.S. to show ACCU's expectation is confined only to consumer goods. Hunter cited no Wisconsin decision to that effect. Nor has the Court found any.

§ 801.05(3), ACCU has contacts with Wisconsin sufficient to satisfy the requirements of § 801.05(1)(d) which is Wisconsin's "doing business" or "general jurisdiction" provision in the long-arm statute and which confers jurisdiction when the non-resident "[i]s engaged in substantial and not isolated activities within the state." A defendant's activities in Wisconsin are "substantial and not isolated" when the activities are "systematic and continuous." *PKWare, Inc. v. Meade,* 79 F.Supp.2d 1007, 1012 (E.D.Wis.2000). A non-resident's continuing business relationship with a Wisconsin entity, therefore, "is enough to warrant an inference that the defendant benefits from services provided in Wisconsin 'and could therefore be required, as a quid pro quo, to submit to the jurisdiction of the state's courts.'" *Dorf,* 99 F.Supp.2d 994, 997 (E.D.Wis.2000) (quoting *Stauffacher v. Bennett,* 969 F.2d 455, 457 (7th Cir.1992)). The Wisconsin Supreme Court has identified five factors relevant to the inquiry:

(1) the quantity of the contacts;

(2) the nature and quality of the contacts;

(3) the source of the contacts and their connection with the cause of action;

(4) the interests of the State of Wisconsin; and

(5) the convenience of the parties.

*Id.* (citing *Nagel v. Crain Cutter Co.,* 50 Wis.2d 638, 648–50, 184 N.W.2d 876 (1971)).

The defendants point to ACCU's targeting of the Wisconsin market for almost twenty years as evidence of continuous and systematic contacts. Since 1984, ACCU has solicited business from businesses located in the state of Wisconsin in trade journals and over the internet. *See* Defendants' Supplemental Brief at 5–6. ACCU has numerous distributors that sell into the Wisconsin market. ACCU has contracted with at least two service centers to provide service to ACCU's end-users in Wisconsin. *See id.*

Moreover, ACCU's efforts in Wisconsin have borne fruit. Since the early 1990s, at least 500 end-users have purchased ACCU products and filed warranty cards with the company. *See* Defendant's Reply to Supplemental Brief at 7. From January 1, 1999 to August 30, 2002, ACCU conducted at least $531,000 worth of business in Wisconsin. *See id.* Hunter disputes none of these facts. Furthermore, the alleged patent infringement in this case took place in Wisconsin when a Wisconsin company purchased one of ACCU's allegedly infringing products. That the infringing product found its way to Wisconsin is no accident— ACCU has been targeting the Wisconsin market for years.

ACCU's contacts with Wisconsin, therefore, satisfy each of the five factors used by the Wisconsin courts to evaluate the sufficiency of contacts under § 801.05(d)(1). The contacts are high in quantity and significant in quality, and the cause of action arises out of those contacts. Although the last two factors are less important, *see PKWare,* 79 F.Supp.2d at 1013, both likewise favor the exercise of jurisdiction. The state of Wisconsin has an interest in the enforcement of the patent laws of the United States, *see id.,* and litigating this case in Wisconsin would be no less convenient to the parties than litigating the case anywhere else. ACCU and G.S. want to litigate the case in Wisconsin, and Hunter, Snap–On, and Equipment Services are already involved in related litigation there.

For the foregoing reasons, § 801.05(1)(d) applies and allows Wisconsin courts to exercise general jurisdiction over ACCU.

### 3. Personal Jurisdiction Over G.S. Under § 801.05(1)(d) [7]

 The defendants assert that three business relationships, when combined, satisfy the requirements of § 801.05(1)(d) as to G.S. First, G.S. points to a contract that it executed in 1997 with the John Bean Company ("John Bean"), which at the time was a Wisconsin corporation. John Bean was bought recently by Snap–On but the original contractual relationship is still in existence. Second, G.S. notes in 1998, Snap–On, which maintains its corporate headquarters in Wisconsin, bought G.S. Finally, G.S. shows that it has conducted a large amount of business with Snap–On Tools, a Wisconsin corporation and likewise a subsidiary of Snap–On.

Hunter contends that each of these contacts is insufficient to qualify for a finding that jurisdiction exists under § 801–5(1)(d). As to John Bean, Hunter contends that G.S.'s 1997 contract with John Bean does not constitute a contact with Wisconsin because John Bean is no longer incorporated in Wisconsin and maintains no presence there. Hunter further notes that G.S. sends no products to Wisconsin under that contract and that the contract in no way invokes Wisconsin law. As to Snap–On, Hunter correctly notes that, under the Supreme Court's holding in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n. 13, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), jurisdiction over a parent corporation does not necessarily establish jurisdiction over a wholly-owned subsidiary, and that lower courts have held that attendance at regular corporate meetings is not sufficient to confer general jurisdiction.

Finally, as to Snap–On Tools, Hunter notes that there is no actual written contract between G.S. and Snap–On Tools, and that G.S. ships no products to Wisconsin pursuant to whatever agreement exists between those companies.

These observations, even if correct, have little effect at all on the defendants' claim that G.S. has "substantial and not isolated" contacts with Wisconsin. G.S. principally conducts business with Snap–On Tools—to the tune of $7 million over the life of the agreement—and Giuliano Spaggiari, the managing director of G.S., travels to Kenosha, Wisconsin at least three times a year, and meets, for business purposes, with representatives of Snap–On and John Bean while in Wisconsin. The fact that no single document defines the relationship between Snap–On and G.S. is of no moment because they regularly enter into contracts for the sale of goods through the unexceptional mode of placement and acceptance of purchase orders. This manner of contract formation between merchants is fully cognizable under Wisconsin law. *See Waukesha Foundry, Inc. v. Industrial Engineering, Inc.*, 91 F.3d 1002, 1007 (7th Cir.1996). G.S.'s business with Snap–On, therefore, is exactly the type of "continuing business relationship" that, under the Wisconsin long-arm statute, warrants the inference that a defendant has agreed to submit to the jurisdiction of the courts of Wisconsin. *See PKWare*, 79 F.Supp.2d at 1012. G.S.'s further contacts with John Bean and Snap-on Inc. in Wisconsin only confirm the validity of this inference.

7. The defendants have failed to argue in their briefs on this motion that G.S. is susceptible to jurisdiction under § 801.05(3). As discussed below, they do assert in their supplemental reply that G.S.'s manufacture of the infringing product eventually purchased in Wisconsin satisfies due process under a theory of specific jurisdiction. Although this certainly would satisfy the requirements of § 801.05(3), the defendants have failed to satisfy their burden respecting that provision. Given the Court's holding respecting § 801.05(1)(d), however, this failure is of little moment.

## B. Due Process

Because the Court is considering personal jurisdiction in the context of a motion to transfer, it must apply the law of the transferee forum—*i.e.*, the forum where the case "might have been brought" by the plaintiff. The defendant seeks to transfer this action to the Eastern District of Wisconsin, which lies within the jurisdiction of the Court of Appeals for the Seventh Circuit. In a typical action, the district court in the Eastern District of Wisconsin would be bound by Seventh Circuit precedent on the topic, but this is not so in patent infringement cases. In patent infringement cases, the law of the Federal Circuit governs all matters unique to patent law, while regional circuit law applies to procedural matters. Although the issue of whether the exercise of personal jurisdiction satisfies the requirements of due process is arguably procedural, the Federal Circuit has held it to be an issue unique to patent law and, therefore, subject to Federal Circuit law. *See Akro Corp. v. Luker*, 45 F.3d 1541, 1543–44 (Fed.Cir. 1995) (citing *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564 (Fed.Cir.1994)); *see also Allen–Bradley Co.*, 55 F.Supp.2d at 959–60. Accordingly, Federal Circuit precedent guides the due process analysis.

As a general rule, a Wisconsin court may exercise jurisdiction over a non-Wisconsin defendant, if that defendant has sufficient "minimum contacts" with Wisconsin such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Washington*, 326 S.C. 310, 316 (1945). The Federal Circuit has reduced the *International Shoe* formulation to a general two-pronged test: (1) the proponent of jurisdiction must prove minimum contacts with the putative forum state; and (2) once the proponent has met its burden, the opponent may nonetheless defeat jurisdiction "by presenting a compelling case that other considerations render the exercise of jurisdiction so unreasonable as to violate 'fair play and substantial justice.'" *Deprenyl Animal Health*, 297 F.3d at 1351 (quoting *Burger King*, 471 U.S. at 476–77, 105 S.Ct. 2174).

The quantity and nature of contacts that are sufficient to satisfy due process vary depending on the relationship between the contacts and the injury giving rise to the cause of action. Where the litigation arises out of, or is related to, those activities the defendant "purposefully directed" toward the forum, the district court has "specific jurisdiction" over the defendant. *See Burger King*, 471 U.S. at 472, 105 S.Ct. 2174. Where the litigation neither arises out of, nor relates to, the defendant's contacts with the forum, the district court may exercise personal jurisdiction over the defendant only if those contacts are "continuous and systematic." *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 415–18, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (citing *Perkins v. Benguet Consol. Mining Corp.*, 342 U.S. 437, 446–47, 72 S.Ct. 413, 96 L.Ed. 485 (1952)). The defendant's "continuous and systematic" contacts with the forum grant the court "general jurisdiction" over the defendant. *Id.* at 415 n. 9; *see also Deprenyl Animal Health*, 297 F.3d at 1350 (Fed. Cir.2002).

The Federal Circuit has distilled the Supreme Court's holdings respecting specific jurisdiction into a three-step inquiry: "(1) whether the defendant purposefully directed its activities at residents of the forum; (2) whether the claim arises out of or relates to the defendant's activities in the forum; (3) whether the exercise of jurisdiction is reasonable and fair." *Deprenyl Animal Health*, 297 F.3d at 1351

(internal quotation marks omitted). The third factor is, of course, the second prong of the Federal Circuit's general minimum contacts test and the defendant bears the burden of proof on that factor.

The Federal Circuit applies no specific test in assessing whether a defendant's contacts with the forum are "continuous and systematic," and thereby sufficient to justify the exercise of general jurisdiction. Rather, courts must evaluate the facts of each case in making the determination. *See LSI Industries, Inc. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed.Cir. 2000). As with all minimum contacts inquiries, once the proponent of jurisdiction meets its burden of establishing minimum contacts, the opponent has the burden of proving that the exercise of jurisdiction would not comport with "fair play and substantial justice." *Burger King*, 471 U.S. at 472, 105 S.Ct. 2174.

### 1. ACCU

#### a. Specific Jurisdiction

■ The defendants argue that the Wisconsin Court's exercise of specific jurisdiction over ACCU would comport with due process under the stream of commerce theory. Under the stream of commerce theory, "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. at 297–98. The Supreme Court has subsequently split over the degree to which the defendant must intend for the product to arrive in the forum state to satisfy the theory, *see Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), but that debate has no bearing on the analysis here. The Federal

Circuit has made clear that, under either of the *Asahi* formulations, where a defendant places a product in the stream of commerce knowing that the likely destination of the product is the forum state, and where the defendant's "conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there," the exercise of jurisdiction in the forum state is consonant with due process. *Beverly Hills Fan*, 21 F.3d at 1566.

As noted above, ACCU placed one of its allegedly infringing products in the stream of commerce in Minnesota. The evidence indicates that ACCU knew that Wisconsin was a likely destination of its product. ACCU maintained a customer service center in Wisconsin, contracted with a regional distributor in a neighboring state, and generally markets its full line of products to customers in Wisconsin, as evidenced by the large number of end-users of ACCU products in Wisconsin. *See* Defendants' Supplemental Brief at 5–6. Although ACCU did not sell the infringing product directly to the Wisconsin customer, it intended for the product to wind up there. This level of "purposeful direction" is sufficient to satisfy the first step of the Federal Circuit's methodology for assessing specific jurisdiction. The second step of the methodology is likewise satisfied because, as noted above, the claims of patent infringement arose out of ACCU's targeting of the Wisconsin geographic market.

#### b. General Jurisdiction

■ The defendants argue that general jurisdiction over ACCU is appropriate for the same reasons it satisfied the Wisconsin long-arm statute. Indeed, the judicial tests both require the contacts to be "continuous and systematic." Hunter cites no authority (and indeed makes no argument) for the proposition that a factual predicate

satisfying the long-arm statute may nonetheless be insufficient to satisfy due process, and the Court's research reveals none. Accordingly, having found ACCU's contacts to be "systematic and continuous" under the long-arm statute, the Court finds those contacts sufficient to satisfy due process.

### c. Fair Play And Substantial Justice

In determining whether the exercise of jurisdiction is "fair and reasonable" the Federal Circuit has identified five factors a court should consider:

1. The burden on the defendant;
2. The interests of the forum state;
3. The plaintiff's interest in obtaining relief;
4. The interstate judicial system's interest in obtaining the most efficient resolution of controversies;
5. The shared interest of the several states in furthering fundamental substantive social policies.

*Deprenyl Animal Health, Inc.*, 297 F.3d at 1355.

Hunter makes no argument that the exercise of jurisdiction over ACCU would not be fair and reasonable. Indeed, since the issue arises in the context of a motion to transfer venue, Hunter is in the awkward position of showing that the defendants' preferred forum is not fair and reasonable to the defendants. Notwithstanding Hunter's failure to argue the point, the only one of these factors that would support a finding of unreasonableness in this case would be the first. ACCU might be less bur-

dened if it litigated the case in its home state, but ACCU's desire to transfer the case seriously mitigates the strength of this supposition. In contrast, the fourth factor strongly supports transfer. The Wisconsin Court is in position to tap the store of knowledge about wheel alignment systems it developed in related litigation and resolve this controversy much more efficiently than a court in any other forum could. Accordingly, the Wisconsin Court's exercise of jurisdiction over ACCU would be fair and reasonable.

### 2. G.S.

#### a. Specific Jurisdiction [8]

■ Although the defendants fail to argue that G.S.'s contacts with Wisconsin satisfy the specific jurisdiction provision of the Wisconsin long-arm statute, they do argue that these contacts satisfy the specific jurisdiction requirements of due process. Specifically, the defendants argue that, under the holding of *Beverly Hills Fan* respecting the situs of patent injury, G.S., as the manufacturer of the allegedly infringing product, injured the plaintiff through patent infringement in Wisconsin when Backroads bought the Accu–Turn aligner. As noted above, the defendants must prove that G.S. purposefully directed its activities toward Wisconsin residents and that the cause of action arose out of those activities. *See Deprenyl*, 297 F.3d at 1351.

Unlike the analysis respecting ACCU, the issue of purposeful direction is a closer call here. Since G.S. employs ACCU as its

---

**8.** At oral argument, counsel for Hunter, citing *Cavallo v. Star Enterprise*, 100 F.3d 1150, 1152 n. 2 (4th Cir.1996), argued that the Court should not consider any argument respecting a Wisconsin court's specific jurisdiction over G.S., since the defendants raised this argument for the first time in its supplemental reply memorandum. The *Cavallo* case addresses rules respecting briefing in cases on appeal, and is therefore inapposite in this case. Moreover, in arguing that the Wisconsin court would have personal jurisdiction over G.S., the defendants placed Hunter on sufficient notice respecting the specific jurisdiction argument.

sole United States distributor, it does not engage in the type of direct marketing and customer service activity that supported the finding that ACCU purposefully targeted Wisconsin residents. Nonetheless, the evidence indicates that G.S. received information notifying it that customers in Wisconsin were purchasing its products. This evidence supports the reasonable inference that G.S. expected its aligners to be used or purchased in Wisconsin. That is especially true where, as here, G.S. chartered ACCU as its exclusive distributor in the United States and ACCU has actively marketed in Wisconsin for years. As the *Beverly Hills Fan* case makes clear, a reasonable expectation that a product placed in the stream of commerce will arrive in the forum state is sufficient to satisfy "purposeful direction." *See* 21 F.3d at 1566.

### b. General Jurisdiction

As with ACCU, the contacts found sufficient to satisfy the general jurisdiction provision of the Wisconsin long-arm statute are likewise sufficient to satisfy the due process requirements for the exercise of general jurisdiction. G.S. has maintained a continuing business relationship with Snap–On Tools, a company headquartered in Wisconsin, and meets at least three times a year with John Bean and Snap–On in Wisconsin. In short, these "continuous and systematic" contacts support the conclusion that G.S. could reasonably expect to be sued there.

### c. Fair Play And Substantial Justice

For the reasons noted above respecting ACCU, the exercise of jurisdiction over G.S. comports with fair play and substantial justice. G.S. itself prefers the Wisconsin forum and the Wisconsin Court is in the best position to resolve the case efficiently.

### 4. Conclusion

Both ACCU and G.S. are amenable to jurisdiction under the Wisconsin long-arm statute and a Wisconsin Court's exercise of jurisdiction over them would comport with due process. Equipment Services and Snap–On also are amenable to personal jurisdiction in Wisconsin. Hence, as the foregoing analysis indicates, Hunter could have brought this action in the Eastern District of Wisconsin.

## II. The Convenience Of The Parties And Interests of Justice Analysis Under 28 U.S.C. § 1404(a)

Having concluded that the transferee forum is one where the plaintiff could have brought the action originally, it is necessary now to determine whether the convenience of the parties and the interests of justice counsel in favor of transfer. That determination calls into play assessment of the following factors: (1) the plaintiff's choice of venue, which the court should normally accord great deference; (2) the convenience of the parties and witnesses; and (3) the interests of justice, "which is intended to encompass all those factors unrelated to witness and party convenience." *GTE Wireless, Inc. v. Qualcomm, Inc.*, 71 F.Supp.2d 517, 519 (E.D.Va.1999). The "interests of justice" factor encompasses a variety of relevant considerations including, but not limited to, the following: (a) the pendency of related actions; (b) judicial economy; (c) where the operative events occurred; and (d) the relative congestion of the transferor and transferee dockets. *See generally id.*; 17 Moore, et al. § 111.13[1]. The decision whether to transfer rests in the sound discretion of the district court and the moving party bears the burden of proving that transfer to another forum is proper. *See Verosol*, 806 F.Supp. at 592.

## A. Plaintiff's Choice Of Forum

Normally the movant's burden is great because the plaintiff's choice of forum deserves considerable weight. *See id.* However, when "a plaintiff chooses a foreign forum and the cause of action bears little or no relation to that forum, the plaintiff's chosen venue is not entitled to such substantial weight." *Id.* at 592–93 (holding that since the plaintiff chose a foreign forum and that the cause of action lacked any real connection to the chosen forum, that plaintiff's choice of forum would not "impede transfer if the relevant § 1404(a) factors point to another forum"); *cf. Reynolds Metals Co. v. FMALI, Inc.*, 862 F.Supp. 1496, 1501–02 (E.D.Va.1994). Stated differently, the greater the connection of the plaintiff and the operative events to the original forum, the greater the defendant's burden in seeking transfer.

In choosing to sue in the Eastern District of Virginia, Hunter chose a foreign forum. Hunter is a Missouri corporation that has little contact with Virginia in its ordinary course of business. This fact lessens the weight to be given to Hunter's choice of forum. That said, this claim of patent infringement bears marginally more relation to Virginia than it does to Wisconsin. Neither of the allegedly infringing products are produced in either state, but G.S. does distribute its allegedly infringing aligner through ACCU, a Virginia corporation. As a result, Hunter's choice of Virginia as a forum is entitled to significant, if not substantial, weight.

## B. Convenience Of Parties And Witnesses

Because patent infringement actions typically involve the testimony of those associated with the development and production of the allegedly infringing product, "'the preferred forum [in patent infringement actions] is ... the hub of activity centered around [the infringing product's] production.'" *Brown Manufacturing*, 219 F.Supp.2d 705, 2002 WL 2008186, at *4 (quoting *GTE Wireless*, 71 F.Supp.2d at 519). This general rule recognizes that most discoverable evidence will be found around the production site.

In this case, the infringing products are produced neither in Wisconsin nor Virginia, but most of the witnesses are located in the midwestern United States. In fact, a number of the potential witnesses identified by the defendants reside in Wisconsin, including a number of the inventors, while none of the witnesses are located in Virginia. Hence, a number of key witnesses may not be amenable to trial subpoena in this jurisdiction. The defendants have provided substantial evidence showing that the witnesses and documents necessary for completion of this action are not in Virginia. Moreover, as discussed more fully below in evaluating the interests of justice, the parties (excluding G.S. and ACCU) are involved in related litigation in Wisconsin. The facts, taken as a whole, indicate that Wisconsin is a more convenient forum to the parties and the witnesses than is Virginia.

## C. The Interests Of Justice

Finally, the interests of justice factors relevant here—pendency of related actions, judicial economy, and relative docket congestion—strongly favor transfer.

With respect to judicial economy, the Court notes that Judge Adelman has expended significant judicial resources in attempting to resolve the claims of Hunter and Snap–On concerning wheel alignment systems. In addition to the significant expenditure of time, Judge Adelman has employed a court expert to help sort through the various legal issues at considerable cost to the parties. Although the claims that Hunter raises here are distinct

from those raised in Wisconsin, they relate to the same technology. Even if the patents here could be resolved without affecting the litigation in Wisconsin, judicial economy would still favor transfer. As a court in this district has noted: "[w]here a party has previously litigated claims involving certain issues in one forum ... 'a court in that district will likely be familiar with the facts of the case. As a matter of judicial economy, such familiarity is highly desirable.'" *LG Electronics Inc. v. Advance Creative Computer Corp.*, 131 F.Supp.2d 804, 815 (E.D.Va.2001) (quoting *Wheeling–Pittsburgh Steel Corp. v. U.S. EPA*, 1999 WL 111459, *4 (E.D.Pa.)).

The docket congestion factor supports a denial of the transfer motion, but only slightly, and does not outweigh the interest in judicial economy. Specifically, Hunter notes that were the case to be tried in Wisconsin, it would be quite some time before it might reach conclusion, given the current case management protocol for the related litigation. Judge Adelman would likely consolidate the action with the related action and the claims raised here would be resolved only after resolution of the other claims, a process which, according to Hunter, might take several years. Hunter fears that the Wisconsin litigation will not be resolved before April, 2005 when its '789 patent would expire. Hunter consequently would lose the potential remedy of injunction and according to Hunter, the defendants would have "an unfair head start into the market." Plaintiff's Memo. in Opposition to Motion to Transfer at 16. The defendants note correctly that the remedy of money damages would still be available should Hunter prevail on its '789 claim, and, although such compensation might not completely remedy the potential loss of market share, it does mitigate any prejudice to Hunter attending the transfer of the case. Moreover, at oral argument, counsel for defendants promised this Court

that the defendants would work with Hunter to facilitate expeditious litigation of this action before Judge Adelman.

In sum, litigating this action in Wisconsin would be more convenient for the likely witnesses and the parties, and would maximize limited judicial resources. Although Hunter's choice of forum is entitled to some weight in the calculus, the Wisconsin Court's unique expertise in the subject matter of this controversy, and the greater convenience of that court hearing this action outweigh the preference for delivery to the plaintiff's chosen forum.

Transfer will also avoid the risk of inconsistent claim construction of the same or related patent terms and, although it is not possible now to identify all patent terms that will require construction, there is, given the fact that all the patents relate to similar or identical products or processes, a significant likelihood that some of the terms will be the same or similar. This prospect favors transfer.

For the foregoing reasons, it is hereby ORDERED that the motion of defendants to transfer venue to the Eastern District of Wisconsin is hereby GRANTED.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.